[No. B081707. Second Dist., Div. Four. May 8, 1996.]

SHARON BROWN et al., Plaintiffs and Appellants, v.
CALIFORNIA PENSION ADMINISTRATORS AND CONSULTANTS,
INC., et al., Defendants and Respondents.

## COUNSEL

Baltaxe & Baltaxe and Michael F. Baltaxe for Plaintiffs and Appellants.

Reish & Luftman, Mark E. Terman, Mitchell, Silberberg & Knupp, Hayward J. Kaiser and Ann S. Lee for Defendants and Respondents.

## OPINION

**EPSTEIN, J.**—Appellants are investors or spouses of investors in self-directed individual retirement accounts[1] (IRA's) who sought to recover funds based on the failure of respondents, the trustee and administrator of their IRA's, to notify them that the borrower of their funds had defaulted in payments to other investors. We conclude that express provisions in the documents governing the business relationship between the parties limited

[1]An individual retirement account accumulates income from deposits or assets on a tax-deferred basis until retirement. In a self-directed IRA, a participant directs the trustee of the IRA to make particular investments.

the duties of the trustee and the administrator. As a result, neither the trustee nor the administrator had an obligation to provide appellants with information about the performance of investments other than their own.

FACTUAL AND PROCEDURAL SUMMARY

This action originally combined the claims of 41 individuals; only 23 of these individuals remain as parties to this appeal.

Appellants invested in self-directed IRA's (Free Choice IRA's) in which they made their own investment decisions. The investments they selected were purchased by Sanwa Bank California (Sanwa) as trustee, and administered by California Pension Administrators and Consultants, Inc. (CALPAC). The relationship between appellants as IRA investors and respondents CALPAC and Sanwa as administrator and trustee of the IRA's was governed by several documents, including an Adoption Agreement, Plan Document, Participant's Handbook, Disclosure Statement, and Investment Instruction. These documents will be described in detail in the "Discussion" portion of the opinion.

Prior to August 1988, appellants' investments consisted of loans to L & H Finance, Inc., and its principal, Charles Lewis (collectively Lewis), for which appellants received 10-year, interest-only, unsecured promissory notes. Sanwa and CALPAC also acted as trustee and administrator for other IRA clients who loaned money to Lewis.

Sometime in 1986, Lewis stopped paying interest on promissory notes held in some IRA's being handled by CALPAC and Sanwa for appellants and other investors. In August 1988, Lewis failed to pay principal due on a promissory note held in the IRA of one of these other investors. That investor made demand of CALPAC for payment of his Lewis note. CALPAC requested and Sanwa sent demand letters to Lewis, but Lewis did not pay the note. A similar sequence occurred in December 1988 in connection with a Lewis note held in the IRA account of another nonappellant investor. After August 1, 1988, appellants made additional loans to Lewis, some through their IRA plans (new IRA loans) and others outside their IRA plans (new outside loans).

Lewis filed for bankruptcy in September 1990. Sanwa received notification of this filing from the bankruptcy court by letter dated September 10, and promptly notified appellants. Appellants pursued claims against Lewis in the bankruptcy court, and filed actions in superior court against CALPAC and Sanwa. They alleged that despite knowledge by CALPAC and Sanwa in

August 1988 that Lewis had ceased to make principal and interest payments on IRA notes held by other investors, CALPAC and Sanwa failed to notify appellants of that fact. Had appellants been informed of Lewis's failure to pay, they would not have made further unsecured loans to Lewis. Appellants sought to recover the amounts of their new IRA loans and their new outside loans. Their complaints included causes of action for breach of contract, negligence, negligence based on contractual duty, and breach of fiduciary duty.

In a ruling in one case which was applied to actions by all these appellants, the trial court sustained respondents' demurrer without leave to amend to the cause of action for breach of fiduciary duty, and granted respondents' motion to strike allegations for breach of contract based on new outside loans and appellant's prayer for damages for emotional distress.

Respondents moved for summary judgment, which was granted. The court awarded respondents attorney fees and costs. Appellants filed timely appeals, and challenge the court's rulings sustaining the demurrer, granting summary judgment, and awarding attorney fees and costs.

## DISCUSSION

## I

### *Duty*

In one of their four summary judgment motions, respondents argued that as a matter of law, they had neither a contractual nor a common law duty to notify appellants that Lewis had defaulted in payments on other IRA loans. "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) An appellate court determines de novo whether there is a genuine issue of material fact and whether the moving party was entitled to summary judgment as a matter of law. (*Daniels* v. *DeSimone* (1993) 13 Cal.App.4th 600, 607 [16 Cal.Rptr.2d 615].)

### *Contractual Duty*

We look first at whether respondents had a contractual duty to notify appellants about Lewis's failure to pay interest or principal to other IRA

investors. The parties agree that the relevant documents are the Adoption Agreement, Plan Document, Disclosure Statement, Participant's Handbook, and Investment Instruction.

## A.  *Adoption Agreement*

CALPAC required that an individual opening or transferring a self-directed Free Choice IRA account complete an "IRA Participant Enrollment Form." Paragraph C of the enrollment form, the "Adoption Agreement," provides: "I hereby adopt, and agree to, the terms and conditions of the [CALPAC] Master Individual Retirement Account under which [Sanwa] (hereinafter Trustee) acts as Trustee and [CALPAC] (hereinafter Plan Administrator) acts as the Plan Administrator. . . . [¶] For purchases or sales of assets other than listed securities, I shall notify the Plan Administrator in writing of the specific investment, transaction broker, and other parties involved. [¶] In connection with my purchase or sale of any listed security in my account, I shall place the order with my broker through the account opened by the Plan Administrator. My broker will contact the Plan Administrator for instructions in opening such account. Upon receipt from the broker of confirmation of the transaction, the Plan Administrator is hereby authorized to instruct the Trustee to undertake whatever steps are necessary to complete said transaction without further authorization by me. I hereby authorize and direct the Trustee to make payment and/or deliver securities against payment on the basis of such confirmation in absence of written instructions from me to the contrary. [¶] *I hereby release and discharge the Trustee and Plan Administrator from, and agree to indemnify both the Trustee and Plan Administrator from and agree to indemnify both the Trustee and Plan Administrator against, and hold each harmless from, any and all claims, actions, or liabilities (and all expenses including attorney's fees incurred in defending against any of the foregoing) arising out of the designation and directions set forth in this letter.*" (Italics added.)

## B.  *Plan Document*

CALPAC's "Master Individual Retirement Account" referred to in the Adoption Agreement was contained in an 11-page "Plan Document." Article VII of the Plan Document addresses the investment of trust assets. Paragraph 7.01 provides in part: "All Trust investments shall be made in accordance with directions given to the Plan Administrator in writing by the Individual, who shall select the media of investment, including reinvestment, disposal and exchanges, of all funds in the account. *The Trustee and Plan Administrator shall have no discretion with respect to, and no responsibility for, such investments.*" (Italics added.)

Paragraph 7.02 provides: "It is intended that the funds in an Individual's Account shall be invested and reinvested in all types of investments allowable under the Code and designated from time to time as a permissible investment medium by the Trustee and Plan Administrator. No part of the Account shall be invested in life insurance contracts, and no part of the Account shall at any time be commingled with other property except in a common trust fund or a common investment fund qualified for the purpose of investing assets of individual retirement accounts." Paragraph 7.02 describes types of investments which the individual can designate, including (a) savings accounts; (b) regulated investment companies; (c) annuity contracts; (d) stocks; (e) common trust fund; (f) automatic stock investment plan; (g) bonds; and (h): "Other Authorized Investments. The Individual shall have the right to direct that a specified portion, as determined by the Trustee and Plan Administrator, of his Account shall be invested in any other investment medium which is an authorized investment under the Code, and which is designated in writing from time to time as a permissible investment medium by the Trustee and Plan Administrator."

Paragraph 7.03 provides: "*Neither the Trustee nor the Plan Administrator shall have any duty or responsibility whatsoever to make any review of investments or to inquire into the propriety of making, selling, or retaining any investment, nor shall the Trustee or the Plan Administrator be accountable for any loss sustained by reason of any action taken or omitted pursuant to the provisions of this Article VII.*" (Italics added.)

Article XIII describes the administration of the trust. Paragraph 13.01 provides: "The Trust shall be administered by the Plan Administrator who shall be responsible for the operation of the Trust in accordance with its terms. *It shall be the responsibility of the Individual to determine the amount of the contributions and distributions to be made hereunder and neither the Trustee nor the Plan Administrator shall be responsible for any consequences to the Individual resulting from the making of contributions, investments or withdrawals.* . . . The Plan Administrator shall determine all questions arising out of the administration, interpretation, and application of the Trust." (Italics added.)

Paragraph 13.02 sets out the power and authority of the Trustee "to do all acts, to execute and deliver all instruments and to exercise for the sole benefit of the Individual any and all powers which would be lawful to it were it in its own right the actual owner of the property held, including by way of illustration, but not in limitation of the powers conferred by law, the following: [¶] (a) To invest and reinvest trust assets (if directed to do so in

accordance with the terms hereof) in savings or similar accounts, Certificates of Deposit or other deposits in a bank or savings and loan association, including those maintained by the Trustee: . . ."

Article XVI contains miscellaneous provisions, including paragraph 16.07: "Trustee and Plan Administrator may rely upon any direction, election, or notice by the Individual until receipt by them of notice of his death or incompetence which notice establishes such fact to their reasonable satisfaction. In the event any investment direction is, in the opinion of the Plan Administrator or the Trustee, ambiguous, the Plan Administrator and the Trustee need not act thereon, but the Plan Administrator shall promptly give Individual notice thereof."

C. *Disclosure Statement*

Paragraph 8 of the "Disclosure Statement" for CALPAC Free Choice IRA's contains language similar to that in article VII of the Plan Document regarding the individual's responsibility to make investment decisions. The final portion of paragraph 8 provides: *"Neither the Trustee nor the Plan Administrator shall have liability whatsoever for losses of any kind resulting from the making of any investment, from the retention of any specified investment unless and until you direct its liquidation and for a reasonable time thereafter, from any other action taken in accordance with your investment directions, from any failure of the Trustee or Plan Administrator to act in the absence of such investment direction, or from the exercise of the Trustee's option to pay any charges, expenses, or other items incurred in connection with your IRA. [¶] Neither the Trustee nor the Plan Administrator shall have any duty, whatsoever to question, to review, or to make any recommendations in connection with the acquisition, retention, or disposing of any investments in your IRA."* (Italics added.)

D. *Participant's Handbook*

Participants in CALPAC's Free Choice IRA's were given a "Participant's Handbook and Appendix." Section XII of the Participant's Handbook describes investment procedures: *"As the owner of a CALPAC 'Free Choice' IRA, it is your responsibility to select the investments with which to fund your plan."* (Italics added.) Various allowable types of investments are described in this section, including "Bankers Acceptances, Commercial Paper, Other Money Market Funds and Government Obligations: To invest in money instruments other than the CALPAC/Sanwa Bank C.D. Fund, you must send a directive letter to CALPAC stating the amount of money to be invested, the type of investment and the terms of the investment. (See Form G-1.)

Since the interest payable in these types of investments is constantly changing, you should consult your investment advisor before making these types of investments."

E.  *Investment Instruction*

Each time an IRA participant decided to make an IRA investment, he or she was required to sign an "Investment Instruction." This form stated in part: "*I understand and acknowledge that CALPAC, Inc. and Sanwa Bank California, Trustee, are making this investment on my instruction and that they, or either of them, are not responsible in the event that this investment does not prove successful, whether in whole or in part, or fails totally. [¶] I understand that neither CALPAC, Inc. nor Sanwa Bank California, Trustee, are knowledgeable concerning the suitability of this investment, and that neither of them have any knowledge or opinion concerning the agent or firm from whom I am purchasing said investment. [¶] Furthermore, it shall be the responsibility of the undersigned to follow up on the performance of said investment and render additional instructions as may be required. The undersigned shall be responsible for obtaining legal counsel to enforce any legal proceedings which may be required to protect this investment.*" (Italics added.)

Respondents argued that these written agreements unambiguously limited their contractual and common law duties to appellants, absolving them of any duty to investigate, select or monitor appellants' IRA investments. We agree. The documents repeatedly advised that appellants were to make their own investment choices, and that respondents would carry out direct written investment instructions and account for appellants' funds in their possession, but undertook no responsibility for the soundness of the investment choice or the performance of the investment. It is difficult to imagine language that would more clearly limit a contracting party's duty to another. (See *Metz* v. *Independent Trust Corp.* (7th Cir. 1993) 994 F.2d 395, 397-398.)

Appellants dispute that respondents limited their duty, relying on the closing language of the Investment Instruction,[2] which provides: "As their only responsibilities, CALPAC, Inc. and Sanwa Bank California, Trustee, shall follow my instructions, account for funds in their possession, *and notify me of any irregularity which may come to their attention.* [¶] I agree to hold

---

[2]This portion of appellants' argument relates only to those appellants who executed Investment Instructions. Other appellants did not because they had made IRA loans to Lewis through a predecessor IRA administrator and trustee, and later transferred their accounts to respondents. As to these "transfer appellants," the only relevant documents are the Plan Document and Adoption Agreement.

*harmless CALPAC, Inc. and Sanwa Bank California, Trustee, from any losses
incurred by my account or accounts in following my instructions unless such
loss was caused by their negligence.*"[3] Appellants argue that when respon-
dents became aware of Lewis's failure to pay interest and later principal on
loans to some of its other IRA participants, they had a duty to notify
appellants of this "irregularity" which had come to their attention. This
interpretation is inconsistent with the basic tenets of contract law.

Civil Code section 1641 provides: "The whole of a contract is to be
taken together, so as to give effect to every part, if reasonably practicable,
each clause helping to interpret the other." The Investment Instruction
expressly limits respondents' responsibility for the success of any invest-
ment and places the responsibility for following the performance of any
investment solely on the participant. Reading the irregularity clause to
require respondents to notify appellants of Lewis's failure to make payments
on other IRA accounts would change the express allocation of responsibility
*to monitor the performance of its clients' investments.* Not only would it
reallocate responsibility in direct contravention of the contract terms, it also
would extend that responsibility by requiring respondents to report to appel-
lants about the performance of similar investments *by others*. Taking all the
parts of the Investment Instruction as a whole, we find that interpretation
unreasonable.

The broad interpretation urged by appellants also is inconsistent with the
explicit language in the other plan documents limiting respondents' respon-
sibilities with regard to appellants' investment choices. Once again, we
follow basic contract law, as set out in Civil Code section 1642: "Several
contracts relating to the same matters, between the same parties, and made as
parts of substantially one transaction, are to be taken together." The plan
documents refer to the participant's responsibility to direct respondents to
make investments by means of instructions in writing; indicate it is the
participant who selects the investment and that the administrator and trustee
have no discretion with respect to and no responsibility for the investments;
release the administrator and trustee from any responsibility to review
investments or inquire into the propriety of making, selling, or retaining any
investment; and relieve the trustee and plan administrator from responsibility
for the consequences of any choice of investment. The Participant's Hand-
book includes the Investment Instruction, which, as we just discussed, limits
respondents' responsibilities regarding the choice and performance of invest-
ments. The only notice obligation is set out in paragraph 16.07 of the Plan

---

[3]The parties refer to the first sentence as the "irregularity clause" and the second sentence
as the "negligence clause." We adopt these terms.

Document, which provides: "In the event any investment direction is, in the opinion of the Plan Administrator or the Trustee, ambiguous, the Plan Administrator and the Trustee need not act thereon, but the Plan Administrator shall promptly give Individual notice thereof." Reading all these documents together, as we must, we conclude that the irregularity clause in the Investment Instruction does not require respondents to give notice to appellants of any problem in the actual performance of another investor's investment.

The contracts, read together, did not impose any duty on respondents to notify appellants that Lewis had failed to make interest or principal payments to other IRA investors. It follows, of course, that respondents' failure to give such notice did not breach the negligence clause in the Investment Instruction. Respondents had a duty to provide account information to each participant with regard to his or her own IRA. Appellants' own evidence was that CALPAC provided appellants with quarterly statements, and that those statements reflected that Lewis made interest payments to appellants until 1986, but not after that date. Appellants do not, and cannot, complain that respondents failed to meet their duty to report to appellants on appellants' own IRA account activity.

*Due Diligence*

■ Appellants also assert respondents had a separate contractual duty not to continue to accept their new IRA investments. They base this claim on various "due diligence" provisions in the plan documents. The language appellants rely on gives respondents the right to accept or reject certain investments. For example, article VII, section 7.02 of the Plan Document provides: "It is intended that the funds in an Individual's Account shall be invested and reinvested in all *types of investments* allowable under the Code and designated from time to time as a permissible *investment medium* by the Trustee and Plan Administrator." (Italics added.)

Appellants rely also on the portion of section XII of the Participant's Handbook titled "Other Prudent Investments," which states: "CALPAC maintains a policy of considering any investment vehicle brought to it by a plan participant. If you are interested in a specific investment which is not outlined in this manual, you may submit details of the investment to CALPAC for its review and consideration. The trustee has the ultimate authority to accept or reject any investments proposed." But the opening language of that section explains: "Under CALPAC's 'Free Choice' plan you may direct your individual account to acquire a wide variety of assets.

Different purchase procedures must be followed, however, depending upon the *type* of investment being made. This section of the Handbook will attempt to outline the requirements for the most common *types* of transactions. For special transactions not contained herein, please contact CALPAC before making any commitments." (Italics added.)

Appellants quote the Disclosure Statement, which provides in paragraph 8(c): "You have the right to direct all or a specified portion of your account be invested in any other investment medium which is authorized or not prohibited under the Internal Revenue Code, and which is approved by the Plan Administrator and Trustee as permissable [*sic*] form of investment."

It is clear from the emphasized portions of the Plan Document, Participant's Handbook, and Disclosure Statement that the only review contemplated by CALPAC and Sanwa is of the *type* of investment, not the quality or performance of the investment. It is equally clear that respondents had no obligation to approve or disapprove the type of transactions involved here, which were promissory notes. Among the types of transactions listed in the handbook as permitted investments are "Bankers Acceptances, Commercial Paper, Other Money Market Funds and Government Obligations." Promissory notes are a type of commercial paper, and hence a type of investment described in the handbook. No further "due diligence" review was required as to whether these were a suitable type of investment.

### Negligence

■ The final theory of duty presented by appellants is the common law duty of due care. As to those appellants who signed an Investment Instruction, this theory is simply a relabeling of their breach of contract claims as tort claims. The Supreme Court has rejected the transmutation of contract actions into tort actions "in favor of a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (*Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [44 Cal.Rptr.2d 420, 900 P.2d 669].) No such independent duty existed here.

There were other appellants who did not sign an Investment Instruction. As to them, the only available theory was negligence.

■ "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this

essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].)

Respondents certainly had the duty to perform ministerial functions as plan administrator and trustee with due care; no claim is made that they failed to do so. But respondents retained no discretion as to appellants' choice of investments, nor any responsibility for advising about the risk of any investments. (See *Metz* v. *Independent Trust Corp.*, *supra*, 994 F.2d at p. 402; see also *Nymark* v. *Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089 [283 Cal.Rptr. 53].) Those functions were expressly excluded from their relationship, and allocated to appellants as part of appellants' authority to "self direct" their accounts. Since appellants' losses were allegedly caused by their lack of notice that Lewis had defaulted on other loans, and since respondents had no duty to provide that notice, appellants cannot succeed on their cause of action for negligence.

We have concluded as a matter of law that respondents had neither a contractual nor common law duty to inform appellants of Lewis' failure to pay interest or principal on other IRA's. In the absence of duty, there can be no contractual breach and no negligence. Summary judgment was properly granted on the basis of duty. Since we find that the trial court's resolution of that question supports the judgment, we need not discuss the propriety of the grant of summary judgment based on damages, or of the grant of respondents' motion to strike directed to claims for damages for new outside loans and for emotional distress. (See *Safeco Surplus Lines Co.* v. *Employer's Reinsurance Corp.* (1992) 11 Cal.App.4th 1403, 1406, fn. 1 [15 Cal.Rptr.2d 58].)

II

*Breach of Fiduciary Duty*

Appellants assert the trial court erred in sustaining respondents' demurrer without leave to amend to their causes of action for breach of fiduciary duty. Appellants alleged that CALPAC as administrator and Sanwa as trustee owed fiduciary duties to appellants based on their discretionary duties "to notify plaintiff of any irregularity which they found and the duty to exercise due care in following the terms of the Investment Instruction. The existence of such discretionary duties makes said defendants a fiduciary . . . ."

"In order to plead a cause of action for breach of fiduciary duty, there must be shown the existence of a fiduciary relationship, its breach, and

damage proximately caused by that breach. The absence of any one of these elements is fatal to the cause of action." (*Pierce* v. *Lyman* (1991) 1 Cal.App.4th 1093, 1101 [3 Cal.Rptr.2d 236].)

Appellants rely on *Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690 [69 Cal.Rptr. 222] and *Duffy* v. *Cavalier* (1989) 215 Cal.App.3d 1517 [264 Cal.Rptr. 740] for the long-settled rule that a stockbroker owes a fiduciary duty to his or her customer. (See also *Hobbs* v. *Bateman, Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174 [210 Cal.Rptr. 387]; *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378].) In each of these cases, the stockbroker was an adviser to the customer about investment decisions.

In our case, as we have explained, the relationship between appellants and respondents encompassed very limited responsibilities. Much like the situation in *Petersen* v. *Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445, 1456 [277 Cal.Rptr. 468], the relationship was confined to respondents' performance of transactions selected by their customers; respondents had absolutely no responsibility to advise appellants with regard to the wisdom of their investment choices. This was not an expansive fiduciary relationship giving rise to a duty to notify the customer of the risky nature of an investment, or in our case, of the poor performance of similar investments held by different customers. (See also *Metz* v. *Independent Trust Corp.*, *supra*, 994 F.2d 395, 402; *Mars* v. *Wedbush Morgan Securities, Inc.* (1991) 231 Cal.App.3d 1608, 1614-1615 [283 Cal.Rptr. 238].) Appellants did not and cannot allege facts supporting a cause of action for breach of fiduciary duty.

## III

### Attorney Fees

Appellants' final complaint is that the trial court should not have awarded attorney fees to respondents. They argue their action was based solely on the Investment Instruction, which did not contain an attorney fee provision, not on the Adoption Agreement, which did contain such provision. But in their second amended complaint, appellants expressly alleged that the relationship between CALPAC and Sanwa was embodied in the Plan Document, and that when appellants signed the Adoption Agreement, which adopted the terms of the Plan Document, appellants became parties to the Plan Document. They further alleged that pursuant to the authorization in paragraph 7.03 of the Plan Document, appellants were required to and did sign the Investment Instruction adopted by CALPAC, which constituted a

contract between appellants and respondents. Appellants' suit on the Investment Instruction encompasses the underlying plan documents setting forth the contractual obligations of the parties to the Investment Instruction, including the attorney fee provision in the Adoption Agreement. (See *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1505 [234 Cal.Rptr. 779].)

The first paragraph of the Adoption Agreement states that the plan participant agrees to the terms of the Plan Document. The second paragraph addresses transactions such as those involved in this case, where the participant purchases assets with IRA funds by notifying the plan administrator in writing (i.e., with an Investment Instruction) of the specific transaction. The third paragraph concerns the purchase and sale of listed securities through a broker. The fourth paragraph is the attorney fee clause: "I hereby release and discharge the Trustee and Plan Administrator from, and agree to indemnify both the Trustee and Plan Administrator from, and agree to indemnify both the Trustee and Plan Administrator against, and hold each harmless from, any and all claims, actions, or liabilities (and all expenses including attorneys' fees incurred in defending against any of the foregoing) arising out of the designation and directions set forth in this letter."

Those appellants who executed Investment Instructions alleged that respondents breached the irregularity and negligence clauses of the instruction. Since the Investment Instruction serves as the notification in writing for the purchase of IRA assets described in the second paragraph of the Adoption Agreement, this is an action "arising out of the designation and directions set forth" in the Adoption Agreement. Appellants are therefore obligated to indemnify respondents for all expenses, including attorney fees, incurred in defending against the suit. There was a proper contractual basis for the award of attorney fees.

Appellants argue the Adoption Agreement is unenforceable as a contract of adhesion. A party claiming a contract is adhesive must provide evidence that the challenged provision is standard in other similar agreements, thereby establishing that the party's only choice was to adhere to the contract or reject it. (*West* v. *Henderson* (1991) 227 Cal.App.3d 1578, 1586 [278 Cal.Rptr. 570].) Appellants offered no such evidence.

Finally, appellants claim the amount of fees awarded was excessive. The trial court has wide discretion in determining the amount of an attorney fee award under a contract. (*Sternwest Corp.* v. *Ash* (1986) 183 Cal.App.3d 74, 76 [227 Cal.Rptr. 804].) We find no abuse of discretion in the court's award

of attorney fees and costs of $4,694.41 to Sanwa, and $3,862.24 to CALPAC against each plaintiff who signed the Adoption Agreement.[4]

Nor do we find any error in the court's refusal to apportion fees between the contract and tort claims. The determinative issue of duty was common to both the contract and tort causes of action, and apportionment therefore was not required. (See *Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 129-130 [158 Cal.Rptr. 1, 599 P.2d 83].)

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

---

[4]As of this date, 18 appellants have entered into stipulations with Sanwa and CALPAC in which appellants dismiss their appeals, and respondents waive their rights to recover the awarded costs and attorney fees from the settling appellants.