Filed 7/29/13  Strohbach v. Unit. Gen. Title Ins. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT STROHBACH et al., | |
| Plaintiffs and Respondents, | G046362 (Consol. with G046923) |
| v. | (Super. Ct. Nos. 30-2009-00118762 & 30-2009-00122175) |
| UNITED GENERAL TITLE INSURANCE COMPANY et al., | ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

The petition for rehearing filed July 12, 2013 by appellant United General Title Insurance Company is DENIED.

The unpublished opinion filed June 26, 2013 is hereby modified as follows: On page 21 of the slip opinion, under the heading "5.  Mitigation," substitute the following paragraph in place of the paragraph there now:

"United General's mitigation argument is a variation on the blame-it-on-Martin argument we have just addressed.  This variation is that the Strohbachs should have realized sometime, either before or after escrow closed, that Zanderholm and Ross were crooks and stopped the deal.  As we have just explained, as to anything before escrow closed, there is no evidence or legal theory that suggests the Strohbachs could not rely on the escrow process itself as a guard against any dishonesty of Zanderholm and company.  As to events after the escrow closed, United General does not point to any

evidence that the Strohbachs actually discovered or had cause to discover Zanderholm and Ross's fraud prior to the loan coming due.  The most it can do is point to some evidence suggesting Martin might have been aware by late October that there was yet no performance bond in place.  But in that regard we note that Zanderholm and Ross kept up the pretense of the Sierra Cobre development *after* the close of escrow, and submitted false invoices to TSA from L&N, which then went back to Coastline for Zanderholm to use on things other than the Sierra Cobre project.  In the face of such an elaborate cover-up, it cannot be said the Strohbachs were "on notice" of any fraud.

This modification does not affect the judgment.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT STROHBACH et al., | |
| Plaintiffs and Respondents, | G046362 (Consol. with G046923) |
| v. | (Super. Ct. Nos. 30-2009-00118762 & 30-2009-00122175) |
| UNITED GENERAL TITLE INSURANCE COMPANY et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment and an order of the Superior Court of Orange County, Franz E. Miller, Judge. Judgment affirmed in part; reversed and remanded in part. Order affirmed.

Songstad Randall Coffee & Humphrey, L. Allan Songstad Jr., and William D. Coffee for Defendant and Appellant United General Title Insurance Company.

Wolff Law Corporation and Joshua M. Wolff for Defendants and Appellants Jeffrey J. Ross and Coastline Management Corporation.

Carothers DiSante & Freudenberger and Steven A. Micheli for Plaintiffs and Respondents.

*     *     *

## I.  INTRODUCTION

A lot of bad real estate loans were made in 2007.  This is the story of one of them.  As the evidence at trial would later show, this really was a "liar loan," and this action–sans the chief liar – was brought to sort it out.

Two Tustin investors, Robert and Lisa Strohbach, decided to make a loan of $1.98 million to real estate developer Steven Zanderholm to fund the infrastructure necessary for a housing project in Bisbee, Arizona called the Sierra Cobre Estates.  Unfortunately for the Strohbachs, Zanderholm was, as his CPA's attorney would later put it, "overleveraged and underexperienced."  Zanderholm needed the money from the Strohbachs for things other than the Sierra Cobre project–though he didn't tell the Strohbachs–and so, under the false pretense the money would be used for infrastructure construction at Sierra Cobre, he borrowed money from the Strohbachs, used it elsewhere than Sierra Cobre, and never paid the Strohbachs.

Zanderholm would be sued in at least two other cases by the Strohbachs, but this appeal does not involve him–at least not directly.[1]  Rather, the Strohbachs sued Zanderholm's CPA, the late Jeffrey Ross[2] and his subchapter S company, Coastline

---

[1]     The Strohbachs sued Zanderholm over this transaction in a complaint filed in October 2010 (Orange County Superior Court case number 30-2010-00413432); a copy of the complaint made it into this case as exhibit 401.  Trial testimony also revealed the Strohbachs sued him in Arizona.  For purposes of this appeal, however, the denouement of these actions is irrelevant.

[2]     Ross battled pancreatic cancer for about nine years, eventually succumbing during the pendency of this appeal.  This court granted the motion of his estate to substitute the personal representative of the estate in his place as appellant.

2

Management,[3] for their roles in Zanderholm's fraud. In a separate action, the Strohbachs sued the escrow company which handled the deal, United General Title Insurance Company, on the theory that, had it followed certain escrow instructions, the disastrous loan would never have been disbursed from escrow in the first place. Both actions were consolidated in the trial court. The Strohbachs obtained joint judgments of $2,732,633 against both Ross and United General, representing the original $1.98 million loan plus interest at the legal rate of 10 percent. They also obtained a separate judgment of $1,524,066 against Coastline for conversion, albeit with the proviso their total recovery of compensatory damages was limited to $2,732,633. On top of that, they were awarded punitive damages of $381,066 each against Ross and Coastline (i.e., total punitive damages of $762,132).

Both United General and Ross have appealed, and we consolidated the cases. While each appeal presents its own small battalion of disparate arguments, if there is any common thread, it is the theory of a lack of substantial evidence to support the judgments against each appellant – this on an appellate record that takes up almost six linear feet of shelf space.

We affirm – with the exception of the matter of punitive damages. We have closely examined the evidence of both Ross's (now his estate's) and Coastline's ability to pay a punitive damage award of close to $400,000 each, and are forced to conclude the evidence is insufficient to sustain either award. The punitive damage awards are simply too large in comparison to both Ross's and Coastline's cash flow and assets to pass appellate muster. At the time of trial, Ross's estate might have had around $400,000 in total assets *not counting* liabilities, and had only a $70,000 a year gross

---

[3]     A "subchapter S" corporation is one "whose separate identity is disregarded for tax purposes." (See Saltzman et al., IRS Practice & Procedure (2013) ¶ 13.10 (2)(a).) As a "sub S" corporation, Coastline's profits are taxed directly to Ross, regardless of whether any profit is distributed to him. (See *Valentino v. Franchise Tax Bd.* (2001) 87 Cal.App.4th 1284, 1290 ["the character of a shareholder's pro rata share of S corporation income is determined as if the income were realized directly from the source from which realized by the corporation. . . . This principle is known as the 'conduit rule' . . . ."].)

3

taxable income, while Coastline's total assets, again not counting liabilities, were around $100,000 at best and its cash flow around $36,000 year.

Accordingly, neither punitive damages award can be affirmed and they must be remanded for further proceedings consistent with this opinion. We do not reach the issue of the effect of the death of Jeffrey Ross as it will relate to the remanded proceedings. That is a matter that must be dealt with by the trial court before we can reach it.

## II. FACTS

Given the voluminous nature of the record, we appreciate the burden on counsel for Zanderholm and Ross[4] of trying to fashion, in their opening briefs, a reasonably complete statements of facts. That said, this is as good a case as any to remind appellants that, because they lost at trial, any conflicts in the evidence are resolved against them, and all reasonable inferences from the evidence are drawn in favor of the winners. (See, e.g., *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308 ["The Court of Appeal correctly noted that in evaluating a claim of insufficiency of evidence, a reviewing court must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment."].)

This typically preliminary reference to the standard of review is of particular importance in this case, because, as we shall see when we examine many of the arguments of both United General and Ross, both present a series of "jury arguments"

---

[4] In terms of arguments framed for most of the appeal, we treat Ross and his sub S corporation as one. However, when we discuss punitive damages we will need to distinguish between them, and also between him and his estate.

which completely ignore evidence presented by the Strohbachs.[5] Many of the arguments presented in this appeal simply track the factually-based arguments that actually were made to the jury–including those impliedly rejected.

A. *The Deal*

Real estate broker Rick Martin met with Steven Zanderholm and Jeffrey Ross in August 2007. Zanderholm and Ross wanted an infrastructure loan for a 56-lot project in Brisbee, Arizona called Sierra Cobre Estates. The two gave Martin a summary of the project to be given to the Strohbachs asserting the project—then just vacant land seven miles from the Mexican border— had a value of some $1,550,000. At the time, the property was just vacant land.

A dinner meeting was set up to introduce the Strohbachs to Zanderholm and company. But before that, Martin talked to Ross over the phone, and Ross said, according to Martin's testimony: "Mr. Zanderholm was creditworthy, that he had a strong financial statement, that he owned numerous properties, and that he was a good lending risk, also that he had never been late and had always fulfilled all his obligations." That is, in Martin's words, "He gave him a sterling accounting."

Ross also gave Martin a project summary which was in turn given to Strohbach, showing a purported "as is" value for the vacant land in Sierra Cobre of $1,550,000. The project summary also stated that KE&G would build the infrastructure on the project, and a firm called L&N Design would build the homes. The "improved value" of the 56 lots after just the infrastructure construction was projected to be $3,360,000.

---

[5] Much of United General's opening brief on appeal presents the evidence favorable to it. For example, it notes the relevant escrow officer at United General testified that (and we quote from United General's opening brief) "she was never provided a list of lender requirements by the Strohbachs and that the requirements of the subject transaction were to insure that the Strohbachs' Deed of Trust securing the Note was in a first position against the Project." Translation: She testified she was told she only needed to have a deed of trust in first position before the escrow close. But there was contrary evidence from both Robert Strohbach and agent Rick Martin, and that is important to an evaluation of a substantial evidence argument.

The dinner meeting was held on August 28, 2007. Ross was there. He talked about being the chief financial officer and chief operating officer of Newport Equity Properties, which was Zanderholm's company, and said he was Zanderholm's CPA to boot. Robert Strohbach pulled out Zanderholm's financial statement, set it down on the table, and went through it line by line with Ross who was sitting across from him at the table. Ross, in Strohbach's words, "validated everything." (Another word Strohbach used in his testimony was "vouched.") Ross specifically told Strohbach the Sierra Cobre property was "free and clear."

Strohbach also pulled out KE&G's infrastructure bid. Ross said they "needed to get funding so they could actually complete this infrastructure." After that they planned to go to another lender for a bigger loan to pay off the Strohbachs. Both Ross and Zanderholm told Strohbach they were "not taking a dime out of this project," meaning the loan was to be applied only to completion of the infrastructure.

Ross also gave every indication he was intimately familiar with Zanderholm's financial situation. As Strohbach characterized Ross's overall presentation: "Seems like he had his arms wrapped around Steve Zanderholm's financial situation, what was not only his financial statement, but he knew what was going on with the projects, which was important." Ross "knew" Zanderholm "wasn't delinquent on any loans."

The Strohbachs decided to make the loan. Among the go-ahead factors were Ross's statements about Zanderholm's credit, the fact Ross said Zanderholm was not delinquent on any loans, the significant net worth in Zanderholm's financial statement, and of course the dedication of the loan proceeds to infrastructure construction.

Zanderholm subsequently signed a two-page document, dated September 24, 2007, prepared by Martin, outlining the basic terms of the loan: $1,980,000 to be loaned for 120 days to build infrastructure, with an interest rate of 14 percent. Most of

the loan principal was for "Hard Construction Costs" ($1,548,000) and the balance for things like Martin's broker fee ($59,400) and "Soft Construction Costs" ($200,000). The loan was to be paid back in one big balloon payment of $2,191,200 at the end of the 120-day period. The Strohbachs entered into a formal construction loan agreement which was signed four days later on September 28, 2007.

The loan agreement provided that once the funds were released from escrow they would go to "Title Security Agency of Arizona," or TSA. In turn, TSA would disburse the funds to contractors doing the actual work as they completed each stage of construction.[6]

TSA would also play another role in regard to the loan documents. In addition to the formal loan construction agreement and a separate security agreement, Zanderholm also signed a "Title Security Agency of Arizona Disbursement Agreement" addendum. We will set forth this document in detail when we discuss Coastline's argument against the conversion judgment. Suffice to say this addendum provided that– under certain conditions–the Strohbachs would have the right to take control of the funds in the TSA construction escrow disbursement account.

As to the necessary escrow arrangements, it was Zanderholm who originally suggested the parties use United General as the escrow holder for the loan, and he specifically mentioned Julie Dannelley, a branch manager of the San Diego office, because Zanderholm had "previous experience" with Dannelley and she was familiar with Arizona real estate practices.[7]

Dannelley and Martin had a meeting. Dannelley agreed to use the construction loan agreement as the escrow instructions. Martin made a specific point of

---

[6]     As far as this appeal is concerned, TSA appears to have been a legitimate entity. It paid ostensible construction bills presented to it.

[7]     A never-quite-fully-developed insinuation made by the Strohbachs at trial was that Dannelley was in some sort of corrupt cahoots with Zanderholm – at the very least she treated him as a "regular customer" and followed only his instructions.

7

telling Dannelley not to close the escrow until all of the lender's conditions in the construction loan agreement had been met. In fact, Martin gave Dannelley a handy one-page abstract of the list of conditions necessary. These conditions, basically a checklist prepared by Martin, included a policy of title insurance and a performance bond.

B. *The Close of Escrow*

1. *The Weirdness Involving the Title Reports*

United General, wearing its title insurer hat, generated *two* separate title reports, one dated October 4, 2007 and the other dated October 5, 2007 (exhibits 22 and 21 at trial respectively). The October 4 report revealed, on page 5 at item 13, the existence of a $598,000 pre-existing deed of trust on the Sierra Cobra property But page 5 of the October 5 report ended with item 12. There was no item 13. The October 5 report thus did not show the $598,000 pre-existing encumbrance. It was as if someone had blocked item 13 on the previous draft and hit the delete button.

Dannelley knew of the October 4 report, but never told either Martin or the Strohbachs about the preexisting encumbrance. Supposedly, there had been a release and satisfaction signed September 21, 2007, by the trustee of the deed–the *same* Title Security Agency of Arizona that would later pay any invoice presented to it purporting to be for construction costs on the Sierra Cobre project–declaring the debt had been "fully paid." According to United General's brief, the October 4 title report simply failed to pick up the pay-off of the encumbrance in September, a mistake corrected by the October 5 report. However, Ross himself testified that a particular $200,000 that was disbursed from the escrow on October 5 was used to "make a payment on the $598,000 trust deed." A reasonable jury could thus readily infer the $598,000 debt pre-existing debt certainly

8

had *not* been "fully paid" as of October 4.  Something was rotten in Bisbee which has not yet been fully explained.[8]

### 2. *Close and Disbursement*

On October 4, 2007, the Strohbachs deposited $1,980,000 into the escrow.  Despite receiving no instructions from either the Strohbachs or Martin to close the escrow, and having no evidence of a performance bond in place, Dannelley disbursed the proceeds of the loan over the period October 5 through October 9 – despite a conversation with Robert Strohbach himself on October 5th telling her *not* to close escrow unless all conditions were met.[9]

These disbursements included ostensible payments to an "L&N Design and Construction" for about $180,000, $200,000 to an "LDC Properties" for engineering services.  It was that $200,000 which Ross later acknowledged was used to pay down the $598,000 pre-existing loan on Sierra Cobre.   And of the $180,000 paid to L&N, $117,000 was immediately transferred to Ross's company, Coastline Management.  Martin immediately got his fee of about $56,000.  The remaining undisbursed funds amount to about $1.53 million.  These funds were wired to TSA, ostensibly to pay for future construction work.

In the months after the disbursement to TSA (basically from October 12 through December 21) Ross directed L&N to create a number of dummy invoices for presentation to TSA for payment.  (Ross himself confirmed this at trial but his explanation was that he was just following Zanderholm's orders.)  The money found its

---

[8]    The most favorable inference possible to United General comes from Zanderholm's testimony. (Zanderholm was the only witness called after the Strohbachs rested their cases in chief.)  He said he had an "agreement" with the holders of the $598,000 trust deed to pay them $200,000, in return for which they would release the $598,000 trust deed.

[9]    Not surprisingly, Dannelley's version of the conversation did not include the need for *all* conditions in the construction loan agreement to be fulfilled.  But that is where the standard of review and substantial evidence review comes into play.   According to Dannelley, Martin merely wanted the Strohbach's own deed of trust to be in the first position, and when Dannelley got a title report showing that, Martin authorized her to close the escrow.  But that testimony is trumped by Strohbach's own, in which he recounted telling her "you can't close the loan" until she had verified "all the terms and conditions are met in the construction loan agreement."

way back to Coastline from L&N. And whatever else the money was used for, it was not used for construction at Sierra Cobre.

By early January 2008, all the money in the TSA account was gone. Needless to say, on February 5, 2008, when the balloon payment to the Strohbachs came due, Zanderholm didn't pay it.

That same month, Robert Strohbach confronted Zanderholm and learned no performance bond had ever been obtained, which is not surprising since Zanderholm never actually hired KE&G to do any infrastructure work at all. He never dealt with them beyond getting a bid.

During the balance of 2008, the remaining facets of the swindle came to light. The Strohbachs learned of the falsity of the L&N and LDC invoices that were immediately paid from escrow on October 5, and they learned that various properties listed on Zanderholm's financial statement were either not owned by him at all or were worthless. For example, Zanderholm had shown another Arizona property known as Copper Ridge on his balance sheet, valued at $2.8 million. It turned out that Zanderholm never really owned it at all.

The Strohbachs also learned of the pre-existing $598,000 encumbrance on the Sierra Cobre property. And they learned that KE&G's bid remained only that – a bid; Zanderholm never used the money to hire the firm.

### III. DISCUSSION

A. *United General's Appeal*

Before we address seriatim United General's arguments on appeal, it is important to recount a few of the basics of escrow law. We will start with the definition of an escrow.

The essence of an escrow is a *deposit* of some document or property to a third party to be delivered upon the occurrence of some condition. (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711.) An escrow

10

holder thus functions as the agent of the parties to the transaction, and its potential liabilities derive from the more basic law of agency. (See *Rianda v. San Benito Title Guarantee Co.* (1950) 35 Cal.2d 170, 173 ["Defendant's duty to plaintiffs is to be determined by the application of ordinary principles of agency . . . ."].)

An escrow holder serves two masters. So, if there is some doubt or question as to whether the conditions for the release of the deposit have been fulfilled, the escrow holder must not release the property. (See generally *Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688.)

*Virtanen* represents a particularly strong object lesson about the duties of escrow holders. In *Virtanen*, this court upheld a $2.275 million judgment against an attorney who agreed to act as escrow holder in a stock purchase transaction because he released stock certificates representing some 1.82 million shares of stock to the buyer despite receiving a notice of rescission from the seller, and also despite a telephone call from the seller's attorney demanding he not release the certificates. (*Virtanen, supra*, 140 Cal.App.4th at pp. 695-696.) This court resoundingly held that, even if faced with competing demands, the attorney had absolutely no right to release the certificates to one of the parties to the transaction. At the very least the attorney should simply have held the certificates or, if he was more energetically inclined, filed an interpleader action. Releasing them was the last thing he should have done. (*Id.* at pp. 697-698.)

An escrow holder is a fiduciary to the parties to the escrow. (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 534.) As such, the escrow holder's main job is to strictly comply with the instructions of the parties (see *Rianda, supra*, 35 Cal.2d at p. 173), and, if the instructions are not complied with, the escrow holder can be liable for *both* breach of contract and negligence. (*Amen, supra*, 58 Cal.2d at pp. 531-532.)[10]

---

[10] There is, in fact, a Financial Code section which makes it a criminal violation for an escrow holder to knowingly or recklessly disburse funds other than in accord with the instructions. Section 17414 of the Financial Code provides:

11

While an escrow holder cannot be held liable to a "nonparty" *to the escrow* in negligence–that is the main point of the *Summit Financial* case–there is no basis to conclude that an escrow holder cannot be liable for negligence *to one of the parties to the escrow* in releasing property not otherwise in compliance with the instructions. *Summit Financial* disapproved of a prior Court of Appeal opinion, *Kirby v. Palos Verdes Escrow Co.* (1986) 183 Cal.App.3d 57, which had allowed a third party (an assignee of some property) to recover. In doing so, the high court cited with approval its own prior decisions in *Amen* and *Rianda*, and both those cases plainly provide for negligence claims against an escrow holder. (See *Amen, supra*, 58 Cal.2d at p. 532 [ "Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with the buyer or seller, the injured party acquires a cause of action for breach of contract. . . . Similarly, if the escrow holder acts negligently, 'it would ordinarily be liable for any loss occasioned by its breach of duty.'"]; *Rianda, supra,* 35 Cal.2d at p. 173 ["It is the duty of an agent to obey the instructions of his principal and exercise in his employment reasonable skill and ordinary

---

"(a) It is a violation for any person subject to this division or any director, stockholder, trustee, officer, agent, or employee of any such person to do any of the following:

"(1) Knowingly or recklessly disburse or cause the disbursal of escrow funds otherwise than in accordance with escrow instructions, or knowingly or recklessly to direct, participate in, or aid or abet in a material way, any activity which constitutes theft or fraud in connection with any escrow transaction.

"(2) Knowingly or recklessly make or cause to be made any misstatement or omission to state a material fact, orally or in writing, in escrow books, accounts, files, reports, exhibits, statements, or any other document pertaining to an escrow or escrow affairs.

("b) Any director, officer, stockholder, trustee, employee, or agent of an escrow agent, who abstracts or willfully misappropriates money, funds, trust obligations or property deposited with an escrow agent, is guilty of a felony. Upon conviction, of an offense under this section or similar offenses specified in Chapter 4 (commencing with Section 470), Chapter 5 (commencing with Section 484), or Chapter 6 (commencing with Section 503) of Title 13 of Part 1 of the Penal Code, the court shall, in addition to any other punishment imposed, order the person to make full restitution, first to the escrow agent and then to Fidelity Corporation, to the extent it has indemnified the escrow agent. Nothing in this section shall be deemed or construed to repeal, amend, or impair any existing provision of law prescribing a punishment for such an offense.

"(c) Any person subject to this division who knows of a person's involvement in an abstraction or misappropriation of money, funds, trust obligations, or property deposited with a licensed escrow agent shall immediately report the abstraction or misappropriation in writing to the commissioner and to Fidelity Corporation. No person shall be civilly liable for reporting as required under this subdivision, unless the information provided in the report is false and the person providing false information does so with knowledge and malice. The reports filed under this section, including the identity of the person making the filing, shall remain confidential pursuant to state law."

12

diligence, and, if defendant violated instructions or acted negligently in retaining the check in its files, it would ordinarily be liable for any loss occasioned by its breach of duty."].)

Indeed, for at least 90 years California case law has upheld the principle that an escrow holder is responsible for any loss caused by its negligence.  (*Jones v. Title Guarantee & Trust Co.* (1918) 178 Cal. 375, 380; *Rianda, supra*, 35 Cal.2d at p. 173; *Virtanen, supra*, 140 Cal.App.4th at pp. 695-696.)  In *Jones*, a prospective buyer of the unexpired term of the lease on a property deposited a check for $2,000 (plus some promissory notes for another $5,000) with an escrow company.  The escrow company didn't comply with original instructions requiring certain approvals by the buyer.[11]  After clearing out the issue of whether the buyer was bound by certain amendments to the instructions given the escrow company by certain real estate agents (he wasn't, he didn't "authorize" them, see *Jones, supra*, 178, Cal. at page 379) and determining the defense judgment had to be reversed, the high court observed:  "If plaintiff's property, deposited with the defendant upon certain conditions, was disposed of without compliance with those conditions, the plaintiff was, of course, entitled to recover such damages as he may have suffered through defendant's unwarranted act. *The defendant contends that the plaintiff showed no damage.  But this claim is obviously without merit.  There is evidence that plaintiff's check for two thousand dollars was cashed and the money paid out by the defendant under the amended instructions.*  Apart from any question of the notes, it needs no argument to show that the plaintiff suffered damage by being deprived, without his authority or consent, of the money represented by his check."  (*Id*. at p. 380, italics added.)  Likewise, in *Virtanen*, the $2.275 million judgment against the attorney escrow

___

[11]     The opinion is not entirely clear in its description of the instructions, because it uses the phrase "the lease" apparently to refer also to a sublease to be entered into with subtenants (see *Jones, supra*, 178 Cal. at pp. 377-378), but the opinion is pellucid that the escrow company did not comply with the instructions.  (See *id*. at p. 378.)

13

holder represented the entire value of the stock which the escrow holder improvidently released to the buyer. (See *Virtanen, supra*, 140 Cal.App.4th at p. 694.)

The lesson from *Jones* and *Virtanen* is that the negligent performance of an escrow by way of releasing property contrary to instructions can render the escrow holder liable in negligence for the entirety of the value of the property released. We note that, consistent with the escrow holder's tort duty under the general law of agency, the duty of an escrow holder is limited to the faithful compliance with instructions. In that regard, courts have sometimes used the word "police" to describe a duty the escrow holder doesn't have, i.e., as one appellate court put it, an escrow holder "has no general duty to police the affairs of its depositors." (*Claussen v. First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 435-436, later quoted with approval in *Summit, supra*, 27 Cal.4th at p. 711.) An obvious corollary of the "police rule" is that, assuming faithful compliance with the instructions, the escrow holder can't be held responsible for the fact one of the parties made an improvident deal.

These basics make addressing many of United General's 10 arguments on appeal a little simpler.

       1. *Substantial Evidence*

       a. *Basic Theory*

United General first argues there was no substantial evidence of breach of contract because the *borrower's* written escrow instructions *only* included what Zanderholm instructed it to do and did not include such conditions as a performance bond. This argument borders on the frivolous. The law has been clear for more than a hundred years that escrow instructions can be oral. (See *Cannon v. Handley* (1887) 72 Cal. 133, 144 ["But it is said there was nothing in writing authorizing Cox to hold or deliver the deed. There is nothing in the statute which requires this to be in writing. The statute only requires a note or memorandum in writing as evidence of the contract."]; *Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 807 ["'escrow

14

instructions may be oral, even when some are in writing'"]; *Claussen, supra*, 186 Cal.App.3d at p. 436 ["We also recognize that escrow instructions may be oral, even when some are in writing."]; *Kelly v. Steinberg* (1957) 148 Cal.App.2d 211, 217 ["There is no requirement that an escrow agreement, as such, be in writing."].) Here, the instructions included much more than just Zanderholm's written ones.

Even leaving aside the written one-page checklist that plainly required a performance bond in place, Martin also testified he told Dannelley not to close the escrow until all of the lender's conditions in the construction loan agreement had been met, and there is no doubt that the construction loan agreement required the procurement of a performance bond. And Robert Strohbach was quite emphatic in telling Dannelley orally not to close until all the conditions in the construction loan agreement were satisfied. These were all escrow instructions, and United General was legally required to follow them.

United General argues that it was enough a performance bond from a general contractor merely be *planned*, since the bond was to be procured with funds *from* the escrow. The argument fails for two reasons. One, the language of the written checklist clearly provided for a performance bond that was more than just a glint in Zanderholm's eye. A performance bond had to be in existence. Two, even allowing for the possibility a performance bond might not be formally *paid for* by the time of escrow, Martin testified (as we explain below) that the necessary underwriting and vetting of the project still had to be completed *prior* to the close of escrow. United General certainly cites no text from the construction loan agreement unambiguously providing for a *post-escrow* performance bond.

And if the question was doubtful, United General should have held off distribution until the ambiguity was cleared up. (See *Diaz v. United California Bank* (1977) 71 Cal.App.3d 161, 171 [bank should have held up escrow closure "until the situation was clarified"].) In short, there is plenty here to support the judgment on the

15

basis of the performance bond.  We need not address the mystery of the true origins of the two contradictory October 4 and 5 title reports.

b. *Waiver Theory*

A major theme of United General's brief is that somehow its failure to comply with instructions was excused because, in the aftermath of the escrow, the Strohbachs did nothing to rescind the deal.  United General points to an amendment to the note which the Strohbachs signed in mid-November 2007 agreeing that October 5 was indeed the origination date of the loan.  The thinking behind the waiver theory seems to be that United General's noncompliance with escrow instructions really had nothing to do with the Strohbachs' loss, because the Strohbachs had made their loan to Zanderholm and were prepared to accept the benefits of it after the escrow.  So, when the loan went bad, the Strohbachs had to take the rough with the smooth.

The simple fact is the escrow instructions required a performance bond to act as a built-in circuit breaker in the transaction.  As long as the performance bond condition was met, the Strohbachs could be reasonably assured Zanderholm's project was feasible.  Even though the performance bond was to be obtained by KE&G rather than Zanderholm himself, a reasonable jury could conclude that the process of vetting the project as bid by KE&G would reveal it was untenable from the get-go.  Accordingly, a reasonable jury could also conclude that none of the Strobachs' money would ever have gotten to Zanderholm in the first place if United General had followed the instruction to have a performance bond in place before the funds were released.

2. *Damages*

United General's damage arguments are a variation on the theme of no causation.  United General first asserts that because the loan was disbursed to a borrower who was not creditworthy, the Strohbachs weren't really damaged at all by its noncompliance with instructions.  After disbursement, they insist, the Strohbachs still might have sought rescission.  The problem is, as we just pointed out – as even the 1918

16

*Jones* decision illustrates – the damage was the disbursement itself. It was at that point that the Strohbachs were deprived of the built-in protections afforded by the escrow instructions, particularly the requirement of a performance bond.

At trial, the Strohbachs' counsel provided an apt analogy concerning United General's damage argument. This case is like one where a jewelry store hires a security company to protect it against break-ins at night. The very damage which the security company has been hired to avoid *is* thievery; if a security guard falls asleep and thieves break in and steal the jewelry, the security company is not excused by saying the real harm was caused by the thieves. The real harm is the absence of protection for which the security company was hired.

If we stay with that simile, we confront the store's duty to mitigate its damages by going after the thieves. On this point, United General cites no evidence that the Strohbachs had any reason to suspect that their money was not being used for what it otherwise was supposed to be used for in the period October through December 2007. The thieves got clean away. This is not a case, like *Capell Associates, Inc. v. Cent. Valley Security Co.* (1968) 260 Cal.App.2d 773, 780 where "the same result . . . would have obtained" regardless of the escrow holder's malfeasance. (In *Capell*, the escrow company recorded the wrong deed of trust.) Here, the *transaction itself* would not have been consummated but for the malfeasance of the escrow holder.

United General makes a no-causation argument vis-à-vis the performance bond that is similarly flawed. The theory is that the Strohbachs were supposed to establish an independent value on the bond to establish damages. No. The point of the need for a performance bond was that it was assurance the transaction itself was viable.

United General also suggests, as regards the immediate (October 5) payouts to L&N and LDC that because Martin felt these invoices were legitimate, there was no causation arising from the fact they weren't. Yet again United General misses the point that it was the transaction itself that constituted the Strohbachs' damages because United

17

General ignored the protections which had been built into the escrow. The point also applies to United General's more general theory that since Zanderholm and Ross were crooks, damage was inevitable. Zanderholm and Ross would never have received any money from the Strohbachs in the first place but for the failure to follow the escrow instructions.

### 3. *Contract and Tort*

The only United General argument grounded solely in statute and case law is that it cannot be held liable in negligence for not following instructions because its liability is limited strictly to contract. On this one United General just has its law wrong.

As we have seen, the very-much-viable *Amen* and *Rianda* cases from our high court have clearly fastened on escrow holders the duty to comply with instructions, and the negligent failure so to comply can result in tort liability. United General proffers only one contrary authority – this court's opinion in *Money Store Investment Corp. v. Southern Cal. Bank* (2002) 98 Cal.App.4th 722 – but on examination *Money Store* is not contrary authority and is inapposite to this case.

*Money Store* – unlike our case – involved a lender who was *not* a party to the transaction being facilitated by the escrow, but who did, nevertheless, have a contractual relationship with the escrow holder, a bank. A good chunk of the opinion was taken up simply establishing the existence of a contract as against the bank's argument none really existed. (*Money Store, supra*, 98 Cal.App.4th at pp. 728-729.) The lender sued the bank for distributing the loan proceeds contrary to its instructions, and the bank succeeded in obtaining a summary judgment from the trial court, which this court *reversed*. In the process of reversing on the lender's breach of contract action we made it quite clear we were analyzing the instructions "as a contract and not as an escrow." (*Id.* at p. 729, fn. 3.)

After determining the case had to be reversed – and in what this court explicitly described as "dictum" for "guidance on remand" (*Money Store, supra*, 98

18

Cal.App.4th at p. 730, fn. 6) – we opined that the Supreme Court had rejected the "'transmutation of contract actions into tort actions.'" In the "'absence of violation of 'an independent duty arising from principles of tort law,'" the lender's negligence cause of action was not viable in addition to its quite viable contract cause of action. (*Id*. at p. 732, quoting *Brown v. California Pension Administrators & Consultants, Inc.* (1996) 45 Cal.App.4th 333, 346, other internal quotes omitted.) In sum, what we had to say in *Money Store* applies to contracts qua contracts, not escrows.

In the case before us now, unlike *Money Store*, we *do* analyze the escrow holder's duties as an escrow, not (purely) as a contract. And we further note, in contrast to the *Money Store* parties, the duty of escrow holders not to be negligent vis-à-vis the parties to the escrow is one rooted in the independent duty fastened on the limited agency undertaken by escrow holders toward those parties, and also their concomitant fiduciary responsibilities toward the parties to the escrow.

4. *Martin as Partial Cause*

The next theory advanced by United General is a full–twisting double negative. The argument goes like this: There was no substantial evidence to support the jury's special finding that real estate broker Martin was *not* a substantial factor in causing the Strohbachs harm, so, as we understand it (the argument is never quite fully taken to its logical conclusion), the judgment must be returned to the trial court to be reduced by Martin's contribution. Fleshing out the bones of that argument, it goes like this: Martin knew no performance bond could be obtained, so if Martin had told the Strohbachs of that fact, the Strohbachs would have stopped the deal independent of anything United General did wrong.[12]

---

[12] Here is United General's take on the evidence: "Strohbachs' agent, Martin, however knew no Performance Bond had been obtained and still requested the Strohbachs fund escrow on October 4, 2007. In fact, Martin knew that a Performance Bond could not be obtained until after escrow closed because of the fact that loan proceeds would be necessary to acquire the Performance Bond. (RT, 833:16-834:14)."

19

But appellate courts actually check record references.  The essence of United General's argument is the assumption that Martin *agreed* with United General's basic assumption that it didn't have to worry about the presence of a performance bond prior to close of escrow because no bond could be obtained until after escrow funded in any event.  In fact, when we check the record reference as to Martin's supposed agreement with United General's assumption, we find a different story from the one United General posits in its opening brief.  Martin actually adhered to the basic proposition that the *underwriting* for a performance bond needed to have been completed *prior* to the close of escrow.  He simply allowed for the possibility that *if* the underwriting were completed, the actual *purchase* of the bond could await the close of escrow.

We pick up the testimony at the point in the cross-examination by United General's trial counsel where Martin acknowledged that a performance bond would be obtained by the contractor, not the owner.  The next question was based on the theory that a contractor would not actually obtain a performance bond until after the loan had closed, not before:

"And that you wouldn't you expect a contractor to go out and spend $15,000 on a performance bond until the loan had closed, would you?"

To that, Martin answered, "No, I don't expect them to *spend the money*." (Italics added.)

But in the next question United General's counsel did not get the answer he hoped for.

The question was, "Okay.  And so there's no way to get a performance bond until you spend the money, is there Mr. Martin?"  The substance of Martin's answer to the question would not make it into United General's brief, but we found that he answered:

20

"That's not true.  It's not about getting it.  *It's about having it in place to be able to ascertain the fact that all the paperwork had been filled out and that it was ready to be purchased*."  (Italics added.)  And, in the next breath in answer to United General's question, Martin testified a "commitment to get a performance bond" was enough.

In short, then, Martin's testimony was that even if the actual bond would not be paid for prior to escrow, the *underwriting process* ("the paperwork") had to be completed, which is completely consistent with the Strohbachs' theory of recovery:  The underwriting process was *itself* a kind of insurance policy to guarantee that Zanderholm's project was viable.

5. *Mitigation*

United General's mitigation argument is a variation on the blame-it-on-Martin argument we have just addressed.  This variation is blame-it-on-the-Strohbachs for not realizing *before* escrow closed that Zanderholm and Ross were crooks and stopping the deal then.  That is, if the Strohbachs were more prescient, they would have pulled out of the deal before closing.  This argument is refuted by the absence of any evidence or legal theory which undermines the Strohbachs reliance on the escrow process itself as a guard against any dishonesty of Zanderholm and company.  We note that: Zanderholm and Ross felt it necessary to keep up the pretense of the Sierra Cobre development after the close of escrow, which is why they submitted false invoices to TSA from L&N which then went back to Coastline for Zanderholm to use on things other than the Sierra Cobre project.  A reasonable jury could find that the process of dummied up invoices presented to the TSA account was so well executed that the Strohbachs had no reason to take action against Zanderholm and Ross until it was too late.

6. *Superseding Cause*

Another variation on the theme is blame-it-on-Zanderholm-and-Ross, as supposedly superseding causes of the Strohbachs' loss.  This argument fails because it mischaracterizes Zanderholm and Ross as *independent* actors.  Again, the Strohbachs'

counsel's analogy to the security company hired to prevent break-ins at a jewelry store is apt. The thieves weren't a superseding cause of loss; they were *themselves* the risk of loss. (Cf. *Chandra v. Federal Home Loans Corporation* (2013) 215 Cal.App.4th 746, 756 [no need for instruction on superseding cause in action against loan broker based on forged loan documents accepted by broker because "submission of forged loan documents was highly foreseeable"].)

       7. *Special Instruction No. 2*

       United General requested a special instruction number 2 (called "S12" in the briefing), which was a quotation from *Summit Financial* including the no-duty-to-police language originally found in *Claussen, supra*, 186 Cal.App.3d at pages 435-436, and reiterated the general point that an escrow holder's duty is limited to following the escrow instructions.[13] The court was correct to reject the instruction because what was relevant in it was covered in other instructions (e.g., an escrow holder is "an agent and fiduciary of the parties"), and what was irrelevant was misleading. The Strohbachs' theory was *not* that United General had a duty to "police" the transaction in the sense of directly ascertaining Zanderholm's creditworthiness, but that United General's failure to follow instructions allowed a loan to be consummated that would not have been consummated if the instructions had been followed. The police language had the potential to seriously confuse the jury about the precise nature of the Strohbachs' claim against United General.

---

[13]    The instruction consisted of selected text from *Summit Financial.* Here is the instruction as requested by United General:

    "An escrow holder is an agent and fiduciary of the parties to the escrow." [Citations.] The agency created by the escrow is limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow."

    "In delimiting the scope of an escrow holder's fiduciary duties . . . '[a]n escrow holder must comply strictly with the instructions of the parties. [Citations.]'" On the other hand, an escrow holder 'has no general duty to police the affairs of its depositors'; rather, an escrow holder's obligations are limited to faithful compliance with [the depositors'] instructions. Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions. The general rule that an escrow holder incurs no liability for failing to do something not required by the terms of the escrow or for a loss caused by following the escrow instructions."

United General also complains the court rejected another of its proposed instructions (in this case CACI No. 413) involving custom and practice.[14] But the use note to CACI No. 413 says the instruction "should not be given in professional malpractice cases in which expert testimony was used to set the standard of care." (Judicial Council of Cal., Civ. Jury Instns. (2012) Directions for Use for CACI No. 413, p. 270, citing *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 277.) Rather, the instruction is appropriate "if the standard of care is within common knowledge." (*Ibid.*) In this case there was no question that expert testimony was necessary (and provided) to establish the nature of the standard of care for escrow holders.

8. *The Malpractice Standard Instruction*

By the same token, the trial judge's giving of an instruction telling the jury that United General was held to a tort malpractice standard was exactly correct, as also explained in regard to argument 3 above. While the tort liability of an escrow holder is limited (by itself, it does not guarantee an equitable transaction between the parties), it does extend to the damages caused by not following instructions.

9. *Prior Bad Act Evidence*

Some time ago, Robert Strohbach was convicted of something dealing with his chiropractic practice and there were license revocation proceedings. But whatever happened, the conviction was later expunged under Penal Code section 1203.4 and Robert Strohbach's chiropractor's license was reinstated. Particularly given the expungement and consequent attenuated relationship to Strohbach's own credibility, the trial court was well within its discretion, under section 352 of the Evidence Code, in not

---

[14] The text of the proposed instruction was this:
"You may consider customs or practices in the community in deciding whether United General Insurance acted reasonably. Customs and practices do not necessarily determine what a reasonable person would have done in United General's situation. They are only factors for you to consider. [¶] Following a custom or practice does not excuse conduct that is unreasonable. You should consider whether the custom or practice itself is reasonable."

23

letting this fundamentally unrelated matter become its own mini-trial.  The evidence was properly excluded.

          10.  *Attorney Fees*

          United General challenges a post-trial order of $231,102.50 in attorney fees.  Ironically the order is based on paragraph 10 of the *borrower's* – that is, Zanderholm's – escrow instructions.

          We set out the complete text of paragraph 10 below.[15]  The text clearly authorizes United General to recover its fees against "the parties" if an action is brought "involving this escrow and/or Escrow Holder."  Under Civil Code section 1717, of course, United General's right to recover against a party to an action involving the escrow is reciprocal; that party is able to recover against United General as well.

          On appeal, United General now claims section 1717 does not apply because the attorney fees contemplated in paragraph 10 were only authorized as an expense of an indemnity provision.  (See *Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1337-1338.)  The argument fails because of the actual language found in paragraph 10.  The paragraph consists of four sentences, the first three of which can arguably be confined to the topic of indemnity.  But the fourth sentence is a stand-alone sentence, allowing United General to recover its fees in *any* action involving the escrow.  The introductory clause, "If an action is brought involving this escrow and/or Escrow Holder  . . . ." is broad enough to go beyond the indemnity inherent in any need by United General to file

---

[15]    Under the heading "Conflicting Instructions & Disputes" the paragraph reads;
    "If Escrow Holder becomes aware of any conflicting demands or claims concerning this escrow, Escrow Holder shall have the right to discontinue all further acts on Escrow Holder's part until the conflict is resolved to Escrow Holder's satisfaction.  Escrow Holder has the right at its option to file an action in interpleader requiring the parties to litigate their claims/rights.  If such an action is filed, the parties jointly and severally agree to (a) pay Escrow Holder's cancellation charges, costs (including the funds held fees) and reasonable attorney's fees, and (b) that Escrow Holder is fully released and discharged from all further obligations under the escrow.  If an action is brought involving this escrow and/or Escrow Holder, the parties agree to indemnify and hold the Escrow Holder harmless against liabilities, damages and costs incurred by Escrow Holder (including reasonable attorney fees and costs) except to the extent that such liabilities, damages and costs were caused by the gross negligence or willful misconduct of Escrow Holder."

24

an interpleader action based on some hypothetical squabble among the parties to the escrow.  Paragraph 10 provided for attorney fees not otherwise tethered to mere indemnity claims.  Accordingly, Civil Code section 1717, with its reciprocal fee provision applies, and United General is on the hook for fees in an action "involving" the escrow.  The reasonableness of the fees is not otherwise contested.

B.  *Ross and Coastline Management's Appeal*

Ross and Coastline Management present five major discrete challenges to the judgment.  We have already dealt with one and found it wanting, namely the theory that it was somehow prejudicial error to exclude evidence of Strohbach's conviction of insurance fraud and its subsequent expungement.

The other four are:  (1) no substantial evidence of conversion; (2) no substantial evidence of fraud; (3) jury misconduct because some unnamed jurors supposedly hypothesized about the possibility Ross had secreted money outside the territorial limits of the United States; and (4) the lack of evidence of sufficient assets vis-à-vis the punitive damage awards.  We will reject the arguments concerning conversion and fraud, but agree with the argument on the sufficiency of evidence regarding the ability to pay punitive damages, which obviates any need to address the claimed jury misconduct.  We begin with the fraud issue because it is the plainest ground of liability.

1.  *Fraud*

Woody Guthrie once sang he'd "seen lots of funny men; some will rob you with a six-gun, and some with a fountain pen."[16]  The "robbery" in this case required a circular money trail in order to keep up the deception that the Strohbachs' loan was being used for construction when it wasn't.  This was the trail:  From escrow to the TSA construction account, then to L&N, then to Coastline, and finally to Zanderholm.  KE&G, the supposed contractor who was to do the real work, was not in the loop.  A reasonable

---

[16]     "The Ballad of Pretty Boy Floyd," written in 1939.

jury could easily conclude the detour to L&N was to preserve the pretext that construction was actually taking place at Sierra Cobre when it wasn't. On appeal, Ross claims that since there was no direct evidence any of the money got to him, as distinct from Zanderholm, there was no substantial evidence of fraud.

The argument fails because there is so much evidence Ross and Coastline both knew of and participated in Zanderholm's fraud. First, Ross testified he had an oral arrangement with Zanderholm that he and Coastline would be paid 20 percent of the net revenues of Zanderholm's projects. Even if Ross and Coastline never got paid, they certainly had a strong motive to keep propping up Zanderholm's shaky real estate empire.

Equally important is Ross's relationship with Zanderholm. An agent who knows of and participates in a fraud is just as responsible for the fraud as the principal. (See *Engle v. Farrell* (1946) 75 Cal.App.2d 612, 615 [quoting with approval from California Jurisprudence legal encyclopedia, "'And an agent who knowingly participates in a fraudulent transaction is equally responsible with his principal.'"]; Rest.2d Agency, § 348 ["An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal."]; *Mars v. Wedbush Morgan Securities, Inc.* (1991) 231 Cal.App.3d 1608, 1616 [stating proposition in the negative, i.e., if agent doesn't know of principal's fraud, agent is not liable].)

Let us count the ways (or some of them, we may miss a few) in which a reasonable jury could conclude Ross knew of, and participated in, Zanderholm's obtaining money by false pretenses. First of all we debunk the central fallacy Ross knew nothing of what was going on. He was not only chief financial officer of Zanderholm's company (Newport Equities), but Zanderholm's CPA and – very significantly – also Zanderholm's chief *operating* officer. It was his *job* to know what was going on and to implement it. It beggars credulity to think that in August 2007, much less December

26

2007, Ross didn't know that Zanderholm was "overleveraged" and needed the Strohbachs' loan simply to stave off the next creditor. Nor can we fault the jury for doubting that Ross was unaware of the true state of Copper Ridge, namely that Zanderholm had no ownership interest whatsoever in it. A reasonable jury can readily assume that if a finance officer wears no less than three separate hats in the service of a man with a grossly false financial statement, the finance officer knows what is going on.

Then there were Ross's representations, which may well have struck the trier of fact as the work of a shill. The most obvious flat out factual lie was the statement Sierra Cobre was "free and clear" when it had an existing $598,000 encumbrance. The clincher – what Mark Twain would have called not just a lie, but a damned lie and one grounded in statistics – is revealed in the testimony of Walt Durfey, who acted as Zanderholm's real estate agent in Arizona. He said that as part of Zanderholm's original purchase of the Sierra Cobre, Zanderholm incurred an indebtedness of $598,000 as represented by a note and deed of trust.[17] If Durfey, a mere real estate agent in relationship to Zanderholm, knew about the $598,000 encumbrance, it is inconceivable that Ross, Zanderholm's vouching CPA and chief financial officer, was ignorant of it.

Ross also assured Martin that Zanderholm owned numerous properties and had never been late and had always fulfilled all his obligations. Those weren't just puffy statements of opinion, they were statements of fact proven subsequently to have been untrue.

Then there was the dinner meeting in which Ross "validated everything" in the financial statement. Even if, for sake of argument, Ross had not prepared the statement personally, his validating it to Robert Strohbach would have supported the jury's conclusion.

---

[17] Durfey's testimony was included in the record by way of his deposition. He didn't actually testify at trial.

27

And then there was the skillful execution of the long con, i.e., the post-escrow-close withdrawal of monies from the TSA escrow account. There was no dispute that Coastline prepared the false invoices submitted to the TSA construction account that got the money out of the TSA account and then to L&N where it was then kicked back to Coastline.

There was a surfeit of evidence implicating Ross. The jury reasonably concluded he was up to his ears in Zanderholm's fraud.

2. *Conversion*

The attack on the $1,524,066 conversion judgment against Coastline presents a somewhat closer issue. The issue is close because one normally can't "steal" the proceeds of a loan one otherwise has lawfully in his or her possession; one can only steal (convert) something to which someone else is entitled to immediate possession. (E.g., *Bastanchury v. Times-Mirror Co.* (1945) 68 Cal.App.2d 217, 236 [in conversion action based on lien right "it is not essential that plaintiff shall be the absolute owner of the property converted but she must show that she was *entitled to immediate possession at the time of conversion*" (original italics)].)

One can, of course, commit conversion by preventing repossession of property to which a secured lienholder has a right to immediate possession (see *Hartford Financial Corp. v. Burns* (1979) 96 Cal.App.3d 591 [person in possession of various vehicles which secured creditor was seeking to repossess committed conversion by refusing repossession by creditor's agents]), but in this case there was no effort to repossess the funds, *precisely* because of the successful concealment of the use of the loan proceeds by Zanderholm, Ross and Coastline.

Nonetheless, we conclude there was enough evidence to justify the conversion judgment. Similar to our analysis of Ross's fraud argument, we begin by noting that Coastline, a key relay point in the money circle from the TSA escrow account to Zanderholm, is just as liable for conversion as Zanderholm if it was taking property

28

that didn't, at that point, belong to Zanderholm. (See *Swim v. Wilson* (1891) 90 Cal. 126, 128; *Miller v. Rau* (1963) 216 Cal.App.2d 68, 77; *Wells Fargo Bank v. Dowd* (1956) 139 Cal.App.2d 561, 575; Rest.2d Torts, § 233 ["one who as agent or servant of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant, is subject to liability for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel"].)

So we come to the key question: Were the Strohbachs entitled to immediate possession of the money in the escrow account? This is where the TSA addendum agreement comes in. We quote all the substantive text of the contract below.[18] We conclude, simply based on that addendum, they were. Indeed, the Strohbachs were entitled to the possession of those funds from the very beginning of the $178,000 and $200,000 disbursements on October 5 from escrow, continuing on through the falsified invoices from L&N that found their way, not to the project, but to Zanderholm via Coastline.

---

[18] Here is that text, all bolding changed to regular font:

"The undersigned parties (Owner [STEVEN R. ZANDERHOLM]) and ROBERT L. STROHBACH AND LISA A. STROHBACH (LENDERS) agree that (LENDERS) shall have and retain a beneficial interest in the construction disbursement escrow account as outlined in the original agreement between (TSA) and (OWNER).

"This beneficiary interest in the disbursement account shall not accrue any rights to withdraw funds, approve or disapprove proper disbursements under the original agreement, nor shall any of the interest income earned on this account accrue to the (LENDERS) for the entire duration of the account unless and until one or more of the following occurs:

"1. (OWNER) and/or his assigns or agents are unable to complete this project as outlined in the Construction Loan Agreement.

"2. (OWNER) is in default under the terms of the Construction Loan Agreement and Promissory Note underlying this transaction, and (LENDERS) have foreclosed on said property under their security interest represented by the Deed of Trust.

"In the event of either of these occurrences, the (LENDERS) as beneficiaries to the remaining funds, may direct such funds to the completion of the project according to the original budget, as may be amended from time to time. In the event the (LENDERS) are unable to complete the project with the funds remaining in the Construction Disbursement Account, (LENDERS) may utilize such funds to reduce the total amount due under the original Promissory note and Deed of Trust.

"Upon liquidation by (LENDERS) of the subject property, should the net proceeds exceed the balance remaining due after receiving the balance from the Construction Disbursement Account, such excess shall be refunded to the benefit of the (OWNER), his assigns or estate."

29

The text of the addendum, albeit by negative implication, plainly gave the Strohbachs the right to "withdraw funds" from the TSA construction escrow account if the owner of the funds, Zanderholm, was "unable to complete this project as outlined in the Construction Loan Agreement." The jury could reasonably conclude that Zanderholm was, in fact, unable complete the project as outlined in the construction loan agreement *from Day One, October 5, 2007*.

Specifically, because Zanderholm (with Ross's help) had misled the Strohbachs about the Sierra Cobre property being debt-free, the project started no less than $598,000 in the hole. Then, on top of that, $378,000 of the loan proceeds (in the two distinct payments of $178,000 and $200,000) were diverted to uses other than infrastructure construction. Even giving Zanderholm credit for the $200,000 pay down on the $598,000 encumbrance, that meant there was still at least $398,000 owing on Sierra Cobre even before dime one of KE&G's probable costs of $1.53 million had been spent.

To be sure, Zanderholm had testified he made an agreement with the holders of the $598,000 deed of trust, but the jury was also entitled to remember the basics of Zanderholm's financial situation – he needed the Strohbachs' $1.98 million to do the infrastructure on Sierra Cobre, and he was going to have to make up the $398,000 somewhere. It was a logical inference he would have to use other funds from the TSA account itself – as distinct from other funds he obviously didn't have – to pay the balance.

The upshot was that, even as early as October 5, the project as "outlined" in the construction loan agreement was financially untenable. At that point infrastructure construction was going to need about $1.93 million to complete. (The $1.93 million is calculated this way: $398,000, representing what Zanderholm really still owed on Sierra Cobre and would have to find somewhere, plus $1.53 million, the cost to actually build the infrastructure.) But there was less than $1.6 million left. ($1.98 million in loan

30

proceeds minus $378,000 immediately paid out from escrow, minus Martin's $56,000 equals $1.546 million.)

The addendum provided that the Strohbachs would have control of the money if Zanderholm could not complete the project. It had language to the effect that the Strohbachs could use that money to complete the project "according to the original budget, as may be amended from time to time." But the important point is, they weren't *required* to. The key word in that paragraph is "may," and may is permissive. (E.g., *Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548, 1561 ["The use of the word 'may' denotes a discretionary choice."].)

Because the addendum is sufficient to show the Strohbachs had the right to the *proceeds* as of October 5, we need not deal with the questions of whether, under the terms of the security agreement and the loan construction agreement, the proceeds were really "collateral." Also, because the addendum, as a matter of linguistic interpretation de novo, provides for repossession of the collateral, we need not deal with the question of whether the trial judge erred in allowing that matter to go to the jury.

3. *Punitive Damages*

The final two issues presented by Ross and Coastline both involve punitive damages. They are interrelated in the sense that because the evidence of Ross and Coastline's financial condition showed only relatively modest ability to pay a punitive damage award, some jurors (according to the declarations of two of the jurors) may have been tempted to assume – contrary to the evidence – that Ross and Coastline *just had* to have secret overseas accounts somewhere. (Indeed, according to both declarations, the initial vote was not to award any punitive damages at all.) Because we determine that the evidence, even without regard to juror misconduct, does not support the double $381,006 punitive damage awards, we do not reach the jury misconduct issue.

The basic rule is that an award of punitive damages must be consonant with a defendant's "ability to pay." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 112 [noting

31

the "well-established rule that a punitive damages award is excessive if it is disproportionate to the defendant's ability to pay"]; e.g., *McGee v. Tucoemas Federal Credit Union* (2007) 153 Cal.App.4th 1351, 1361 ["The poorer the wrongdoing defendant, the smaller the punitive damages award will be."].)  By the same token, evidence of "financial condition" is a "prerequisite" for a punitive damage award.  (*Adams, supra*, 54 Cal.3d at pp. 108-109.)  Impartial appellate review of such awards is also necessary to ensure they comply with due process under both the state and federal Constitutions.  (See *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 77.)

Financial condition should not necessarily be equated with "net worth," given that net worth can be manipulated by such accounting devices as amortization and depreciation.  (*Bankhead, supra*, 205 Cal.App.4th at p. 79.)  Thus it *is* possible that given sufficient cash flow and assets punitive damages may be awarded against an entity that technically has no net wealth.  (See *id*. at pp. 78-80.)

However, it is also true that California courts have "disfavored" awards tending to exceed 10 percent of net worth.  (See *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1166 ["It has been recognized that punitive damages awards generally are not permitted to exceed 10 percent of the defendant's net worth."]; *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1163 [upholding award noting it was less than "the 10 percent cap generally recognized by our courts"].)

Cases departing from the 10 percent guideline, however, typically show some offsetting ability to pay punitive damage awards, either by way of cash flow or the existence of hard assets.  So, for example, in *Devlin* the 17.5 percent award represented a mere four months net profit.  (See *id*. at p. 391.)  Likewise, in *Bankhead*, where a punitive damage award of $4.5 million was upheld against a large company whose net worth was technically negative, the company was also doing $3.59 *billion* in sales a year, had a $211 million "cashflow profit," and had – on hand – "some $343 million in cash and cash equivalents."  (*Bankhead, supra*, 205 Cal.App.4th at p. 75.)

Here is what we intend to be a relatively comprehensive summary of the evidence of Ross and Coastline's financial situation when the punitive damages phase of the case was tried, and what "spin" there is on it is in favor of the judgments. As noted, Ross had an arrangement with Zanderholm that he and Coastline would be paid 20 percent of the net revenues of Zanderholm's projects, but, on the other hand, there was no evidence Zanderholm ever paid Ross or Coastline any percentage of anything. Ross testified at length to his financial condition in the punitive damage phase. In sum, his assets were: roughly $80,000 owed him by Zanderholm,, about $42,000 owed him from Coastline, stocks worth about $3,200, a Roth IRA worth about $1,200, cash of around $5,000, two cars worth about $15,000 in total, a mobile home trailer on leased land valued at $10,000, personal property of about $5,000, and a home worth around $950,000, but with an equity of about $386,000 given it had first and second mortgages of $265,000 and $399,000 respectively. There was no evidence the $564,000 in mortgages on his house went to some surreptitious investment or secret stash. The only evidence on the point was his testimony he had no offshore accounts.

Thus, by our rough calculation, Ross's *total* personal assets, not counting any liabilities other than his home mortgages, were less than $400,000. And one of his liabilities – $100,000 for legal fees – would seem, given the heft of the appeal before us, to be quite substantial.

On the income side, Ross's tax returns for 2009 showed *gross* income of $78,458 and for 2010 gross income of $70,000. The most that can be said about his cash flow is that just before trial, in Ross's personal checking account, he had made a series of large deposits (respectively in the months leading up to trial, $10,000, $10,759 $7,900, $9,800, $16,000, and in October 2010, $29,000). But we have found nothing in the record showing the nature of these deposits, or how the offsetting withdrawals might somehow have shown secretion of income. (The Strohbachs certainly don't explain it.) More tellingly, even though the Strohbachs presented the evidence of a forensic

33

accountant to trace the money flow establishing their basic damages of $2.7 million, they did not present any expert forensic evidence of available "cash flow" on Ross's part.

In short, even sopping wet the evidence shows there's no way Ross could come anywhere near paying a $381,066 award. Far from 10 percent or even 17.5 percent of net worth, the award approached 100 percent of Ross's available assets, and much more than that if all the liabilities are taken into account.

And Coastline is even worse off. Coastline's main asset was $102,909.42 owed from Zanderholm's company, Newport Equities. Its tax return income for the *year* 2010 was less than $15,000, and its previous year's income was $36,207, and of course we must remember that Coastline's income would also have shown up on Ross's personal return to be taxed on it. Coastline's gross income in 2011 as the date of trial had not even amounted to $10,000. (Note that Coastline's debt to Ross of $42,000 was counted in our rendition of his assets.) In short, the paucity of evidence of a financial condition consistent with the ability to pay punitive damages of $381,066 that applies to Ross (now Ross's estate) is even more miniscule as to Coastline.

Financial condition is one of three factors governing appellate review of punitive damages originally set out in *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928. The other two are reprehensibility of the conduct and amount of compensatory damages. However, as the Supreme Court made clear in *Adams*, even if the two other factors are present and would otherwise justify the punitive damage award, if it is excessive in relation to financial condition, that "alone" will justify reversal.

34

(*Adams,supra*, 54 Cal.3d at pp. 105, 111.)  We have no choice but to return the matter of punitive damages to the trial court.[19]

## IV.  DISPOSITION

(1)  The joint judgment against both Ross and United General for $2,732,633 is affirmed.

(2)  The judgment against Coastline Management for $1,524,066 is affirmed.

(3)  The attorney fee order against United General of $231,102.50 is affirmed.

(4)  The punitive damage awards of $381,066 each against Ross and Coastline are reversed, and the matter of punitive damages remanded to the trial court for further proceeding consistent with this opinion.

---

[19]     At oral argument the attorney for Ross – and now his estate – raised the issue of whether section 377.42 of the Code of Civil Procedure might preclude the award of *any* punitive damages against Ross's estate. This court invited supplemental briefs from the parties on the issue, and delayed submission to allow time for that supplemental briefing.  In its supplemental briefing, though, the estate did *not* assert that the statute automatically precluded punitive damages, even if the damage award were otherwise subject to reversal.  All the estate's supplemental briefing did was argue that the punitive damage award needed to be "otherwise properly imposed" (quoting *Whelan v. Rallo* (1997) 52 Cal.App.4th 989, 995), and asserted, based on previous arguments, that the existing punitive damage award against Ross was not "otherwise properly imposed."

In light of our reversal of the punitive damage award, our opinion is without prejudice to whatever arguments any party wants to make on remand about the effect of the death of defendant Ross on any punitive damage award to be assessed on remand against the estate.

The Strohbachs are clearly the prevailing parties, and therefore shall recover their costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.