776 So.2d 1049 (2001)
Joan PASZAMANT, etc., et al., Appellant,
v.
RETIREMENT ACCOUNTS, INC., etc., Appellee.
No. 5D00-679.
District Court of Appeal of Florida, Fifth District.
February 2, 2001.
*1050 William G. Osborne of William G. Osborne, P.A., Orlando and Barry N. Greenberg of Mishan, Sloto, Greenberg, Hellinger & Udolf, P.A., Miami, for Appellant.
Anthony Deglomine, III and Nichole M. Mooney of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, for Appellee.
PETERSON, J.
The appellants, Joan Paszamant, as Executrix of the Estate of Robert G. Paszamant, Stephen A. Wise, Judith Wise, Felicia Defuria, and Jonathan Hoffman (collectively "Investors") appeal the summary judgment granted to Retirement Accounts, Inc. Consolidation of the Investors' individual claims against RAI was appropriate in the trial court because each complaint alleged the same cause of action against RAI.
The Investors established self-directed Individual Retirements Accounts known commonly as IRA's under § 408(a) of the Internal Revenue Code. In order to establish a qualified IRA under the code, it was necessary to select a custodian to hold bare legal title to the IRA assets and to report certain activities within an IRA account to the Internal Revenue Service (IRS). Each of the Investors selected RAI as their custodian and completed an Individual Retirement Custodial Account application which included the terms and conditions of the contractual relationship (Custodial Agreement). In summary, the Custodial Agreement provided that RAI had no investment responsibility other than to transfer funds as directed by an Investor and report to the IRS.
Each of the Investors directed written instructions to RAI to send funds provided by the Investor to Plaza Mortgage and Finance Corporation (Plaza). No details about the investment were provided to RAI by the Investor and in each case RAI carried out the wishes of the Investor. Plaza would in turn send an acknowledgment to the Investor with a copy to RAI or in some cases send the acknowledgment to RAI with a copy to the Investor. The acknowledgment indicated receipt of the funds sent by RAI, and also provided the name, interest rate, and principal amount of a mortgage that Plaza had previously owned. After receipt of the Investor's funds, Plaza assigned an interest to the Investor, or to be more accurate, to RAI for the benefit of the Investor. Amortization schedules were also attached.
The president of Plaza described the operation of the corporation's mortgage business during a deposition. Plaza made short term loans secured by first mortgages to property owners in the greater Atlanta, Georgia area. The loans commanded higher rates of interest than normally available, ranging from 11% to 17% annually. Plaza would market the mortgages to investors eager to obtain the higher return on their investments. During the early days of Plaza's business, mortgages on partial interests would be assigned to each Investor and the assignment was recorded. Partial interests were assigned when the amount invested was less than the principal amount of a mortgage resulting in more than one Investor having an interest in a mortgage. When mortgage payments were made, the payments less *1051 Plaza's service fee would be sent to RAI with the Investor receiving notice. When a mortgage was paid in full, the Investor had the opportunity to receive the return of the principal investment or allow Plaza to select another mortgage for reinvestment.
The arrangement worked to everyone's satisfaction for several years. In fact, some of the Investors dealt directly with Plaza and invested non-IRA funds before and after establishing a relationship with RAI. But it all ended when Plaza's checks began to bounce, and it was placed into receivership and finally bankruptcy. Plaza's president explained that his company failed because of the cost and delays in foreclosing loans in default, particularly when the mortgaged property was involved in a bankruptcy.
Plaza's president indicated that in the early days of Plaza's business, mortgage assignments were originally prepared and recorded so that record evidence of an assignment to an individual Investor was available. This proved to be cumbersome for Plaza since Investors would fail or delay sending satisfactions when a mortgage was satisfied. Also, problems arose in foreclosures when an individual Investor had to be named as the plaintiff. In order to eliminate those administrative problems, Plaza prepared assignments to individual Investors, but did not record them. This allowed Plaza to streamline the satisfaction and foreclosure of mortgages in a financially healthy atmosphere, but led to the downfall of the Investors when Plaza failed financially. The bankruptcy trustee relied upon the public records showing Plaza as the owner and claimed ownership of all mortgages in which Plaza appeared to be the mortgagee.
In light of this background, the Investors agree that RAI had no contractual responsibility for their losses at the hands of Plaza. However, they filed their suits against RAI in tort claiming that RAI either negligently performed its duty as custodian by not seeking or assuring reasonable verification that the Investors' funds had been invested in mortgages actually assigned to the Investor or alternatively, that RAI "requested reasonable verification and/or recordable documents evidencing ownership of first mortgages in favor of ... [Investors], but the documentation was not returned to ... [RAI] by Plaza mortgage and ... [RAI] did not take any further steps to obtain the documentation and did not notify the ... [Investors]." The Investors also complain that because RAI did not tell them that Plaza failed to provide documents showing ownership of mortgages securing the investments in favor of Investors that the Investors continued to invest additional funds with Plaza to their detriment.
The Investors' claims were denied when the trial court granted summary judgment to RAI finding that no duty existed independent of the contract and if any contractually extrinsic duty did exist, the Investors could not recover because they did not rely upon it. The court cited Brown v. California Pension Administrators and Consultants, 45 Cal.App.4th 333, 52 Cal. Rptr.2d 788 (1996) in support of its conclusion.
A self-directed IRA was also involved in Brown with the underlying document being strikingly similar to the Custodial Agreement in the instant case. The Brown investors alleged that the custodian breached its fiduciary duties when it failed to notify all of its IRA participants with a common investment that the obligor under the investment failed to pay interest and later principal to one of the IRA participants. The California court held that the custodian was not liable under theories of breach of contract, negligence, or breach of a fiduciary duty. After examining in detail the terms of the contract, the court agreed with the custodian that the written agreements unambiguously limited their contractual and common-law duties to the investors, absolving them of any duty to investigate, select, or monitor chosen investments. The negligence theory was rejected *1052 as an attempt to relabel the contract claims as tort claims. The court noted that the California Supreme Court had rejected attempts to convert contract actions into tort actions in favor of a general rule precluding tort recovery for noninsurance contract breach.
Brown's claim that the custodian breached its duty to notify all investors of any irregularity, to wit: the default, was also rejected. The court recognized that the relationship between the parties encompassed very limited responsibilities. The custodian had absolutely no responsibility to advise the investors with regard to the wisdom of their investment choices.
The Investors' statement of facts contained in their brief in the instant case indicate that they "instructed Appellee to invest monies in real property mortgages to be serviced by a corporation located in Atlanta, Georgia called Plaza Mortgage and Finance Company" citing as record support the Investors' complaint. We have scoured the record and found that the required written instructions indicate only that the Investors instructed RAI to forward a certain amount to Plaza without further instructions. The record also contains copies of forms used by RAI to carry out the instructions of an Investor to forward the funds to Plaza. Two types of forms were used by RAI and were "fill-in-the-blanks" forms obviously designed to apply to all types of investments. All but one of the forms in the record contain the instructions:
Please deliver the item(s) indicated below to this office:
 _____ Certificate of Ownership
 X Written Confirmation of Investment
 _____ Copy of Execute Subscription
 Agreement
 _____ Other
The one exception is again a form with fill in the blanks which contains the following request for items from Plaza:
*Quarterly valuations of the outstanding loan balance.
*Copy of the recorded loan documents (if applicable).
*All loan payments (payable to the above titled lender).
Both forms request Plaza to send duplicates of correspondence but never checks to the Investor whose address is set forth. RAI did not send to the Investors a copy of the requests made to Plaza. Apparently, the Investors are relying on this latter form in their argument that RAI, while under no contractual duty to seek verification that an assignment of a mortgage had been recorded, did so by this request. And when Plaza failed to send an assignment, RAI breached its duty to seek that verification. Further, when Plaza failed to send a recorded assignment in the one case, the Investors claim that RAI should have given all RAI Investors notice of this failure.
The Investors assert that when RAI voluntarily instructed Plaza to forward copies of recorded loan documents, but failed to monitor the transaction to determine whether Plaza responded correctly with recorded documents, RAI created a "zone of risk." Further, when RAI failed to alert not only the owner/investor of the account, but all investors, it incurred tort liability for any consequential damages. Initially, we note that RAI's instruction to Plaza was not so precise as to require the recorded documents to be returned in response. The words "if applicable" are contained in the instruction to Plaza and Plaza's method of acknowledging a customer's investment was to send the service agreement. We also note that the Investors did not receive a copy of RAI's instructions to Plaza; therefore, the Investors could not assume that RAI received recorded instruments in response. Finally, we find nothing in the record that shows the method whereby RAI could determine that the Investors purchased Plaza mortgages unless RAI physically searched each one of *1053 its customer's accounts to determine such an investment.
We disagree with the Investors that a "zone of risk" was created by RAI's instructions to Plaza. The risk of loss was created when each Investor selected Plaza and only instructed RAI to forward funds to Plaza without elaboration. The "zone of risk" concept advanced by the Investors is explained in McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992). McCain was injured when the blade of a mechanical trencher he was operating struck an underground cable installed by Florida Power Corporation (FPL). FPL had sent one of its employees to the site in order to mark a safe area within which to operate the trencher. Conflicting testimony indicated that McCain was operating the trencher in an area marked "safe" when the trencher contacted the cable.
The McCain court explained that Florida recognizes that a legal duty arises whenever a human endeavor creates a generalized and foreseeable risk of harming others. It stated: "Where a defendant's conduct creates a forseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk imposes." Id. at 503 (citing Stevens v. Jefferson, 436 So.2d 33, 35 (Fla.1983)) (emphasis added). The requirement of reasonable, general foresight is the core of the duty element. Duty exists as a matter of law and is not a factual question for a jury to decide. See id. In the case of McCain, FPL created a "zone of risk" when it created the "safe zone." FPL had the duty to avoid the negligent marking of an area when it knew McCain would be relying upon those marks to avoid injury. In the instant case, we have difficulty in applying McCain to determine that RAI created a zone of risk. It neither created a zone of risk nor is it reasonable to conclude that Plaza's response with its usual and customary documents could cause generalized and reasonable foreseeability that a zone of risk would arise in the future.
We disagree with the Investors that it was a jury's task to determine whether RAI had a duty to communicate the alleged failure of Plaza to respond with recorded documents under the Investors theory that RAI created a "zone of risk" as explained in McCain. "Duty exists as a matter of law and is not a factual question for the jury to decide: Duty is the standard of conduct given to the jury for gauging the defendant's factual conduct." Id.
We agree with the trial court that Brown is dispositive of this case. The investors' complaint in Brown was that the administrator failed to give notice of a default and the allegation in the instant case is that RAI failed to give notice that Plaza did not respond correctly to RAI's request for recorded documents. In Brown, the investors sued in contract and in tort and lost on both theories because the contract excluded any duty to advise of choice or risk of investments, and thus, no independent duty of due care arose. In the instant case, the Investors did not pursue any contract claim because the Custodian Agreement also excluded advice with respect to choice or risk. It was the Investors who chose the options of directing and managing their IRA funds, and consequently, the obligation to determine the form of documentation that would reflect their investments.
We also agree with the trial court that Mininson v. Allright Miami, Inc., 732 So.2d 389 (Fla. 3d DCA), rev. denied, 744 So.2d 455 (Fla.1999) supports its conclusion. In that case, Mininson tripped on a public sidewalk which was adjacent to a privately owned parking lot managed by Allright. The surface of the sidewalk had become uneven caused by tree root growth. Mininson argued that because of the provisions of the lease agreement between the owner and Allright, the latter had voluntarily assumed the obligation of maintenance of the contiguous *1054 public sidewalk. The Mininson opinion distinguishes Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla. 1996) where a funeral director voluntarily undertook to lead a funeral procession over public roads. The Union Park court held that the director had a minimal duty to ensure that the procession members proceeded to a cemetery in a safe manner. Although both opinions based their analysis on the Restatement of Torts (Second) § 324 A (1965), the difference in the cases was found in subsection (C) of the restatement that requires reliance by the person harmed. In Union, the members of the funeral procession relied upon the funeral director. In Mininson, the injured person had no justified reason to rely upon Allright for maintenance of a municipal sidewalk when that person had no knowledge of the terms of the lease agreement. In the instant case, the Investors could not rely on RAI for investment advice because of the exclusions in the Custodial Agreement and could not have reasonably relied upon RAI to obtain recorded documents or give notice because they were unaware of RAI's request to Plaza.
Finally, we reject the Investors' argument that experts created a disputed issue of a material fact when they testified that it was an industry standard for RAI to seek verification or documentation that the investment was made. Clearly, it was the Custodial Agreement that governed this relationship. Additionally, the experts' opinions were not necessarily at variance with RAI's actions. RAI did seek verification from Plaza and that verification took the form of the service agreements, amortization schedules, other related but unrecorded documents, and most importantly, checks in repayment of investments and interest. All, except the checks, were received by the Investors. It was their duty, not RAI's to evaluate those documents when they chose to manage their own IRA's.
The summary judgment is affirmed.
AFFIRMED.
SHARP, W. and POWELL, R.W., Associate Judge, concur.