[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15061

_____

D.C. Docket No. 9:12-cv-80317-KLR

DOUGLAS LAMM,
Individually and on behalf of Douglas Lamm IRA,

Plaintiff - Appellant,

versus

STATE STREET BANK AND TRUST,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 14, 2014)

Before MARTIN and JORDAN, Circuit Judges, and BAYLSON,[*] District Judge.

JORDAN, Circuit Judge:

_____

[*] Honorable Michael M. Baylson, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

This appeal mainly concerns what duties a custodian bank has under New York and Florida law to protect a customer from fraudulent transactions carried out by the customer's investment advisor. We hold that, under the facts alleged here, the custodian bank breached no duty, contractual or otherwise, by accepting on behalf of its customer securities that later turned out to be fraudulent and listing those securities on monthly account statements issued to the customer. We therefore affirm the district court's dismissal of the customer's complaint.

## I

We briefly restate the facts alleged in the complaint and recited in the district court's order.

In 2001, Douglas Lamm engaged James Tagliaferri and his investment firm, Taurus Advisory Group, LLC, as investment advisors. Pursuant to S.E.C. Rule 206(4)-2, which requires segregation between an investment advisor's funds and those of his clients, *see* 17 C.F.R. § 275.206(4)–2, Mr. Lamm created two separate custodian accounts, an individual account with Chase Bank and an IRA account with Investment Bank & Trust Company. Mr. Lamm granted Taurus broad authority to invest his assets in both accounts. In 2007, State Street took over the

accounts and assumed the obligations under the corresponding custody agreements.[1]

Around the same time, Mr. Tagliaferri moved his investment advisor company to the Virgin Islands and, from November of 2007 to November of 2009, invested Mr. Lamm's funds in "risky and highly speculative stocks of micro-cap companies, . . . purported notes from these micro-cap companies, and personal loans and mortgages." Compl. at ¶ 25. In settling these transactions, State Street accepted on behalf of Mr. Lamm pieces of paper purporting to be promissory notes and listed those notes on monthly account statements issued to Mr. Lamm. In April of 2011, State Street sent a letter to Mr. Lamm warning him that it could not obtain updated valuations for certain "illiquid, thinly traded, and/or private placement securities" and were thus listing those securities as having no market value. Ultimately, the purported promissory notes turned out to be worthless and resulted in just over $1 million in lost principal to Mr. Lamm.

Mr. Lamm sued State Street, alleging in essence that it had a duty to notify him that the securities in his account were worthless. He asserted claims for breach of express contract, breach of implied contract, breach of fiduciary duty, negligence, gross negligence, aiding and abetting the breach of a fiduciary duty,

---

[1] The relevant portions of the two agreements are nearly identical. We thus refer to them collectively as "the custody agreement." All references to paragraph numbers are taken from the Chase Bank agreement.

3

and aiding and abetting fraud. All claims were based on the following alleged conduct by State Street: (a) allowing Mr. Lamm's funds to be disbursed as payment for fake notes; (b) failing to notify Mr. Lamm that certain of the purported securities were not signed by the purported obligor, but rather by Taurus; (c) failing to notify Mr. Lamm that certain of the purported securities were not payable to him but rather to "Hunter & Co.," a company with the same address as Taurus; (d) allowing cash to be diverted from Mr. Lamm's accounts without timely delivery of a security in exchange; (e) allowing cash to be diverted from Mr. Lamm's accounts without delivery of any security; (f) listing fake CUSIP numbers[2] on the monthly statements provided to Mr. Lamm; (g) issuing monthly statements to Mr. Lamm that included inaccurate, inflated or false market values; (h) charging excessive custodian fees based on false market values; (i) failing to perform the audits, reporting and custodian duties required of IRA custodians;[3] and (j) otherwise failing to report and disclose the obvious fraud of Taurus to securities regulators and Mr. Lamm.

---

[2] The Committee on Uniform Securities Identification Procedures ("CUSIP") facilitates the clearing and settlement process of securities. A CUSIP number identifies most securities, including the stocks of all registered U.S. companies and U.S. government and municipal bonds, and consists of nine characters (including letters and numbers), which uniquely identify a company or issuer and the type of security. *See Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank*, 912 F.2d 756, 761 n.6 (5th Cir. 1990).

[3] Mr. Lamm does not raise the issue of IRA custodian duties in his brief, so we do not address it here.

The district court granted State Street's motion to dismiss Mr. Lamm's contract claims on the ground that State Street had a "merely administrative" role in managing Mr. Lamm's accounts and thus owed him no duty to guard against his investment advisor's misconduct. *See Lamm v. State Street Bank & Trust Co.*, 889 F. Supp. 2d 1321, 1327-31 (S.D. Fla. 2012). The district court also ruled that Mr. Lamm's negligence claims were barred by Florida's economic loss rule, *see id.* at 1332, a doctrine which the Florida Supreme Court subsequently limited to products liability cases in *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013). Finally, the district court concluded that Mr. Lamm had not sufficiently alleged knowledge on the part of State Street, and as a result his aiding and abetting claims had to be dismissed. *See Lamm*, 889 F. Supp. 2d at 1332-33.

## II

We review *de novo* the district court's grant of State Street's motion to dismiss under Rule 12(b)(6), accepting the factual allegations in the complaint as true and construing them in the light most favorable to Mr. Lamm. *See Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the

5

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

## III

New York law governs Mr. Lamm's contract claim under the choice of law provision in the custody agreement. *See American Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir. 2001) (forum state's choice of law rules determine which state's substantive law applies); *Maxcess, Inc. v. Lucent Techs, Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (contractual choice of law provisions are enforceable in Florida absent contravening public policy). Under New York law, "[w]hen interpreting a contract, a court determines the intent of the parties from within the four corners of the contract, giving full effect to the plain meaning of the language used and the parties' reasonable expectations." *Jackson Heights Care Ctr., LLC v. Bloch*, 39 A.D.3d 477, 479 (N.Y. App. Div. 2007). Where a contract is clear and unambiguous, interpretation is a matter of law. *See Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973).

The relevant portions of the custody agreement defining State Street's rights and duties are scattered throughout the document, and we recite them in our analysis as applicable. The basic arrangement was that State Street would hold Mr. Lamm's assets and carry out enumerated transactions as directed "by or on behalf

6

of" Mr. Lamm (sell or purchase securities, transfer funds, etc.). State Street could carry out certain administrative transactions without Mr. Lamm's prior authorization, such as collect interest or dividends, present obligations for payment, and convert currency. Taurus was listed in the agreement as an authorized agent of Mr. Lamm, and State Street was permitted to rely on Taurus' instructions to buy or sell securities or transfer funds to third parties. State Street was to send Mr. Lamm monthly account statements listing the assets in his account. To the extent State Street listed market values on the statements, they had to be from sources State Street "believed to be reliable," even though State Street could not guarantee their accuracy. State Street further assumed no responsibility for supervising investments or making investment recommendations; assumed no liability for losses arising out of account transactions except as caused by State Street's negligence or willful misconduct; and limited its duties to those set forth in the agreement.

The custody agreement thus contemplated that State Street would have no decisionmaking role in Mr. Lamm's investments but would hold Mr. Lamm's assets, carry out his and Taurus' investment instructions, and render accounts, very much like a broker handling a nondiscretionary account. As noted in *Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 711 (N.D. Ohio 2004), a custodian bank with no investment discretion is "much like a broker executing orders given by the

account holder. Its only duty [is] to execute the written orders it receive[s] from [the account holder's] designated agent." Courts have therefore consistently held that the duties of brokers handling nondiscretionary accounts are essentially limited to executing orders. *See J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 1990 WL 95625, at \*5 (6th Cir. July 11, 1990); *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir.1998); *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 824 (10th Cir.1986). With this basic framework in mind, we consider each of Mr. Lamm's allegations and conclude that none is sufficient to state a claim for breach of contract.

First, Mr. Lamm alleged that State Street disbursed his funds to pay for fake notes. Under Paragraph 14 of the custody agreement, State Street was specifically authorized "to purchase or receive securities and make payment therefor" in accordance with Taurus' instructions. Paragraph 5 authorized State Street to honor funds transfers in accordance with Taurus' instructions "without inquiry into the circumstances," and Paragraph 20(A) absolved State Street of the responsibility to "supervise the investment of . . . any investment relating to the account." Paragraph 13 permitted State Street to rely on instructions it "believe[d] in good faith [were] given by or on behalf of" Mr. Lamm and absolved State Street of all liability for following such instructions absent gross negligence or willful misconduct. Finally, Paragraph 20(B) absolved State Street of all liability relating to any transaction,

8

absent negligence or willful misconduct. In short, State Street had the contractual authority to rely on Taurus' instructions, had no duty to ensure that Taurus investment instruments were in valid form, and risked no liability for any transaction absent at least negligence (a matter we discuss later).[4]

Second, Mr. Lamm claimed that State Street allowed cash to be diverted from his account without receiving any asset in return, or without timely receiving any asset in return. Paragraph 14 of the custody agreement authorized State Street to follow Taurus' instructions to "remit funds by wire transfer drawn against the Account, payable to any payee." Paragraph 2 likewise gave State Street the right to deliver Mr. Lamm's property "free against receipt . . . as instructed by or on behalf of" Mr. Lamm. Thus, there was no contractual obligation on State Street to demand an asset, much less timely receipt of an asset, in return for disbursing Mr. Lamm's funds (unlike in the demand deposit context, where a bank can only charge an item against a customer's account if it is "properly payable," *see* U.C.C. §4-401(a)). *See Kaiser v. First Hawaiian Bank*, 30 F. Supp. 2d 1255, 1266 (D. Haw. 1997) (custodian bank not liable where custody agreement did "not expressly

---

[4] Paragraph 3, labeled "Reservation of Right," gave State Street "the right to refuse to accept any investment for the Account which is in a form or condition which [State Street], in [its] sole discretion, determine[s] is not compatible with the services to be performed under this Agreement." As the district court noted, however, this provision gave State Street a right and not an obligation. Although a party granted discretion under a contract must exercise that discretion in good faith, *see Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995), Mr. Lamm's factual allegations do not raise a plausible inference of bad faith on State Street's part.

9

provide that the acquisition of securities must occur simultaneously with the release of funds from the Custodial Account").

Third, Mr. Lamm asserted that State Street issued statements listing fraudulent securities with false or inflated market values. The agreement required State Street to send Mr. Lamm a monthly statement "with a list of the securities held in the Account, including current market value, if available to [State Street]," and to base its marking values on "sources that [it] believe[s] to be reliable." The agreement further specified that State Street could not "guarantee the[ ] accuracy" of the market values it provided. Because of this unequivocal disclaimer of accuracy, the fact that the market values State Street listed in its monthly statements were inaccurate does not, in itself, support a breach of contract claim.

Mr. Lamm's only plausible argument hinges on the "believes to be reliable" language. Yet Mr. Lamm does not allege – nor does he present sufficient factual matter to plausibly allege – that State Street relied on sources that it did not believe to be reliable. Mr. Lamm points out that State Street did not have an explicit contractual right to rely on Taurus for market values (whereas it did have such a right with respect to the buying or selling of securities). Nonetheless, State Street was not prohibited from relying on Taurus for market values so long as it believed Taurus to be reliable (and, again, there is no allegation that it believed otherwise).

10

The fact that the securities State Street received from Taurus had facial defects is insufficient under New York law to support the claim that State Street knew or believed that Taurus was not reliable. *See Rosner v. Bank of China*, 2008 WL 5416380, at \*6 (S.D.N.Y. Dec. 18, 2008) ("red flags" or knowledge of "atypical activities" do not establish awareness of wrongdoing absent independent duty), *aff'd*, 349 Fed. App'x 637 (2d Cir. 2009); *Rizer v. Breen*, 2007 WL 4378149, at 13 (N.Y. Sup. Ct. Jan. 29, 2007) ("[E]ven where a bank disregards several 'badges of fraud,' such as a transfer of funds from a corporate account to a personal account, actual knowledge does not exist.") (Westlaw pagination unavailable). Admittedly, belief that Taurus was not reliable is easier to establish than knowledge that Taurus was engaged in a fraudulent scheme. We are also mindful of the challenge a plaintiff faces in establishing a defendant's mental state without the benefit of discovery. On balance, however, we conclude that Mr. Lamm presented insufficient factual allegations to raise "above the speculative level" his claim that State Street did not believe Taurus was reliable. *Twombly*, 550 U.S. at 555.[5]

A further bar to Mr. Lamm's claim regarding inaccurate monthly statements is the waiver provision in Paragraph 19, which stated that if Mr. Lamm failed to

---

[5]  As to Mr. Lamm's allegation that State Street provided false CUSIP numbers, State Street was not obligated to provide CUSIP numbers, and while it undertook to do so, it did not warrant that these numbers were markers of legitimacy. Mr. Lamm's claim with respect to the CUSIP numbers is in essence a negligent misrepresentation claim, which we reject later.

object within 60 days to any statement issued by State Street, he "shall be deemed to have approved such statement, and [State Street] shall be released, relieved and discharged with respect to all items set forth therein." Mr. Lamm argues that where the bank does not provide the customer sufficient information to detect an error, no basis exists to enforce the waiver provision. The only authorities he cites to support this proposition, however, are cases interpreting § 4-406 of the Uniform Commercial Code, which provides that where a depository bank "provides sufficient information" to its customer in its account statements, the customer must "promptly notify the bank" of any unauthorized payment "if, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment." U.C.C. § 4-406 (a), (c). *See ADC Rig Services, Inc. v. JPMorgan Chase Bank, N.A*, 641 F.Supp.2d 617, 621 (S.D. Tex. 2009); *Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W. 3d 89, 91 (Tex. 2000).

These cases are distinguishable, as § 4-406 of the U.C.C. specifically provides that a customer only waives his right to object to an unauthorized transaction if the account statements issued by the bank provide him "sufficient information" to discover the transaction. No such language exists in the custody agreement between Mr. Lamm and State Street. The district court's analogy to *Puerto Rico Telephone Co., Inc. v. SprintCom, Inc.*, 662 F.3d 74, 95 (1st Cir. 2011) (construing waiver provision in billing dispute between two telephone carriers),

12

was thus apt. That case illustrates the basic proposition that, in the absence of a controlling statute like § 4-406 of the U.C.C., or bad faith on the part of the nondisclosing party, a waiver provision requiring one party to make objections within a certain time is not tolled or rendered unenforceable because the other party fails to provide "sufficient information" where the contract "included no such exception to the operation of the Waiver Provision." *Id.* at 97.

Finally, Mr. Lamm alleged that State Street charged excessive fees based on market values that later turned out to be inflated. There is some discrepancy in Mr. Lamm's complaint as to which fee provision controls.[6] In any case, it seems implausible to us, absent some indication of the parties' contrary intent, that the custody agreement obligated State Street to assess quarterly fees based on anything other than the market values it reported in its account statements. As the Second Circuit noted in *Pujals v. Standard Chartered Bank*, 2013 WL 4017034, at *2 (2d Cir. Aug. 8, 2013), a fee structure that would require a bank "to continuously

---

[6] Paragraph 22 of the custody agreement, entitled "Fees and Expenses," authorized State Street "to charge the Account for all fees and expenses incurred in connection with the Account and for custodian fees based on the custodian fee schedule in effect from time to time." There is no allegation in the complaint that State Street departed from this fee schedule. Indeed, there is no mention of the fee schedule in the complaint or in Mr. Lamm's brief, and it does not appear in the record. The complaint relies instead on Paragraph 16 of the custody agreement, where the following clause is handwritten: "Fee equal to five basis points (.0005) annually, payable quarterly, in advance. No transaction fees. Fee guaranteed for a minimum of two years from account inception. Minimum annual fee is $800, or $400 for related accounts." As State Street points out, however, this fee provision was only guaranteed for "two years from account inception." According to the complaint's own timeline, this would have been from 2001 to 2003, whereas the disputed account activity began in 2007. There is no allegation in the complaint that the fee provision in Paragraph 16 was extended beyond the two-year minimum.

13

reevaluate the monthly fees it had charged [customers] in prior months as subsequent events revealed the [market value] used in prior months to be over- or understated" is not feasible. Even assuming that there is an ambiguity in the contract regarding whether the ultimate basis for the fee is "actual value" or "reported value," as in *Short v. Connecticut Cmty. Bank*, 2012 WL 1057302, at *7 (D. Conn. Mar. 28, 2012), the waiver provision again thwarts Mr. Lamm's claim. Because Mr. Lamm failed to object to the market values reported in State Street's monthly statements, he is "deemed to have approved" those market values and cannot challenge them now, whether for the purpose of disputing the fee assessment or holding State Street liable for his investment losses.

In sum, Mr. Lamm's allegations, accepted as true, failed to state claims for breach of contract.

## IV

The district court ruled that under *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) (concluding that contract's narrow choice of law provision did not govern plaintiff's tort claims, and applying choice of law rules of the forum state to determine the applicable law), Florida law governed Mr. Lamm's tort claims, and neither side contests that ruling on appeal. The district court did not address the merits of Mr. Lamm's tort claims because it held that the economic loss rule barred the claim. Given the Florida Supreme

14

Court's recent decision limiting the application of the economic loss rule to the products liability context, *see Tiara Condo. Ass'n,* 110 So. 3d at 407, Mr. Lamm no longer faces this hurdle.

*Tiara* may, however, have left intact a separate hurdle, namely that "a party still must demonstrate that . . . the tort is independent of any breach of contract claim." *Id.* at 408 (Pariente, J., concurring). While the exact contours of this possible separate limitation, as applied post-*Tiara*, are still unclear, the standard appears to be that "where a breach of contract is combined with some other conduct amounting to an independent tort, the breach can be considered negligence." *U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.*, _____ So. 3d ____, 2013 WL 5225374, at *2 (Fla. 2d DCA Sept. 18, 2013). All of the conduct alleged by Mr. Lamm relates to the performance of the custody agreement, and thus might theoretically fall within the ambit of a breach of contract claim, but it appears that the conduct nonetheless amounts to an "independent tort" under current Florida law. *See Marian Farms, Inc. v. SunTrust Banks, Inc.*, ___ So. 3d ____, 2014 WL 25585, at *1 (Fla. 5th DCA Jan. 3, 2014) (claims against depository bank for negligence in accepting forged loan documents, personal guarantees, and corporate resolution of corporate customer could be brought as torts independent of depository agreement). Because the law is still somewhat unsettled in this area, and because the custody agreement specifically left open the possibility that State

15

Street could be liable for losses caused by its negligence, *see Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp.2d 1254, 1263 (M.D. Fla. 2010) (allowing tort claim against bank where account agreement acknowledged that bank "could be held liable for losses caused by [its] own negligence"), we address the substance of Mr. Lamm's tort claims. We conclude that the claims fail because Mr. Lamm points to no source of authority imposing on State Street a duty to "be an extra pair of eyes watching the investment advisor." Appellant's Br. at 9.

## A

The first element of a negligence or gross negligence claim under Florida law is "a legal duty owed by [a] defendant to [the] plaintiff." *Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So.3d 783, 789 (Fla. 2d DCA 2010). "Florida [ ] recognizes that a legal duty [arises] whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Florida Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). "Duty exists as a matter of law and is not a factual question for [a] jury to decide." *Id.*

Courts in other jurisdictions have held that custodian banks with no discretion to invest a customer's assets have no independent duty to supervise transactions on a customer's account or to ensure that assets held for the customer are marketable or in valid form. *See Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 712 (N.D. Ohio 2004) (under Ohio law, custodian bank does not owe "any

16

duties beyond those made explicit in the Custody Agreement"); *Kaiser v. First Hawaiian Bank*, 30 F. Supp. 2d 1255, 1264 (D. Haw. 1997) (under Hawaii law, custodian bank has "no duty to monitor and report on" transactions made in customer's securities account and no liability for accepting securities that are "worthless on their face"); *Abbott v. Chem. Trust*, 2001 WL 492388, at \*7 (D. Kan. Apr. 26, 2001) (under Kansas law, custodian bank had "no duty to investigate" assets in customer's self-directed IRA). Florida law generally accords with this unequivocal line of authority.[7]

For instance, in *Paszamant v. Ret. Accounts, Inc.*, 776 So. 2d 1049, 1051 (Fla. 5th DCA 2001), investors in self-directed IRAs brought negligence claims against the custodian bank holding their IRA accounts for failing to notify them that a mortgage in which they invested was not assigned to their investor but rather still held by the original mortgagee, which ultimately went bankrupt. The trial court found that "no duty existed independent of the contract," which "absolv[ed]

---

[7] Florida courts have not ruled extensively on the duties of custodian banks, as distinguished from depository banks. As to the latter, the Florida Supreme Court and this Court have held that they generally have no duty to investigate transactions made by authorized agents of the account holder. *See Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So.2d 443, 446 (Fla.1968); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir.2003). We find this line of authority instructive, but not controlling, because of the differences between custody accounts and demand deposit accounts. Nonetheless, the burden is on Mr. Lamm to point to Florida law establishing the existence of a legal duty on custodian banks. *See Cooper Hotel Servs., Inc. v. MacFarland*, 662 So. 2d 710, 712 (Fla. 2d DCA 1995) ("the burden of proof is on the plaintiff to establish that . . . the defendant had a duty to protect the plaintiff").

[the custodian bank] of any duty to investigate, select, or monitor chosen investments." *Id.* The Fifth District affirmed, holding that because "the contract excluded any duty to advise of choice or risk of investments, . . . no independent duty of due care arose." *Id.* at 1053. Although there was no third-party investment advisor in that case, this distinction is not dispositive because State Street, like the bank in *Paszamant*, had no discretionary role in investing Mr. Lamm's assets, was fully authorized to rely on Taurus' investment instructions, and had no duty to monitor the transactions made by or on behalf of Mr. Lamm or to scrutinize the form in which they were submitted. *See id.*

Mr. Lamm attempts to extract from S.E.C. Rule 206(4)-2 the proposition that custodian banks engaged as "qualified custodians" owe customers a duty of protection from ill-intentioned investment advisors. This argument fails because, by its plain terms, Rule 206(4)-2 applies only to investment advisors and not to custodian banks. *See* 17 C.F.R. § 275.206(4)–2 (rule applicable to "investment adviser[s] registered or required to be registered under section 203 of the [Investment Advisor's Act]").

Moreover, on a broader level, the policy underlying Rule 206(4)-2 does not support imposing such a duty on the part of custodian banks.[8] The drafters of the

---

[8] Rule 206(4)-2 was promulgated pursuant to the Investment Advisor's Act of 1940 ("IIA"), which was the last in a series of laws passed in the wake of the stock market crash of 1929 to "eliminate certain abuses in the securities industry." *Sec. & Exch. Comm'n v. Capital*

18

Rule were clearly worried about investor advisors misusing client assets, or advisors' creditors reaching those assets, but the system they created, for better or for worse, was one of mere segregation between advisor and client assets. *See S.E.C. v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 177 (D.R.I. 2004). The drafters did not place any affirmative obligations on custodians to oversee advisors' transactions. Mr. Lamm understandably asks "what possible benefit or value" it serves to have a bank act as a custodian if it does not scrutinize the transactions made by his advisor. One answer is that segregation makes misuse harder in that an advisor cannot directly spend his client's funds, *see, e.g.*, *S.E.C. v. Merrill Scott & Associates, Ltd.*, 505 F. Supp. 2d 1193 (D. Utah 2007); another is that segregation, coupled with regular reporting, makes it easier for clients to monitor their own accounts, *see* Custody of Funds or Securities of Clients by

---

*Gains Research Bureau, Inc.,* 375 U.S. 180, 186 (1963). The IIA put in place a legal framework for monitoring the investment advisory business, including registration and disclosure requirements and prohibitions on "fraudulent, deceptive, or manipulative" practices. *See* 15 U.S.C. §§ 80b-3, -5 and -6. Building on this general scheme, Rule 206(4)-2 "requires advisers that have custody of client securities or funds to implement a set of controls designed to protect those clients' assets from being lost, misused, misappropriated or subject to the advisers' financial reverses." Custody of Funds or Securities of Clients by Investment Advisers, 68 Fed. Reg. 56692–01, 56692 (Oct. 1, 2003).    Specifically, under Rule 206(4)-2, advisors must not mingle clients' funds with their own but must engage a "qualified custodian" to hold client assets either "(i) [i]n a separate account for each client under that client's name; or (ii) [i]n accounts that contain only [the advisor's] clients' funds and securities, under [the advisor's] name as agent or trustee for the clients." 17 C.F.R. § 275.206(4)–2.  Moreover, under the Rule as amended in 2003, the advisor must either have the qualified custodian send his clients quarterly statements regarding their accounts or, if the advisor sends the statements himself, undergo a yearly audit by an independent public accountant. *See* Custody of Funds or Securities of Clients by Investment Advisers, 68 Fed. Reg. at 56692.

19

Investment Advisers, 68 Fed. Reg. at 56697 (Oct. 1, 2003) (Rule 206(4)-2 "enable[s] advisory clients to identify questionable transactions early and allow them to move more swiftly"); a third is that segregation insulates a client's assets from his advisor's creditors or other financial "reversals," *id.* at 56692. Neither the text nor the policy of Rule 206(4)-2 contemplate any active role on the part of qualified custodians other than safely holding assets and providing reports.

In search of an authority imposing an independent legal duty on custodian banks, Mr. Lamm points to Fla. Stat. § 674.103(1), Florida's version of U.C.C. § 4-103, which provides that banks cannot disclaim responsibility "for failure to exercise ordinary care." Article 4 of the U.C.C., however, applies to bank deposits and collections, and the standard of care it articulates applies to specific actions relating to the processing of checks and similar instruments, such as presenting a check for payment or sending a customer a notice of dishonor, none of which is at issue here. *See* U.C.C. § 4-202 (describing "types of basic action with respect to which a collecting bank must use ordinary care"); *Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 191 (Mont. 2006) (U.C.C. standard of ordinary care governs "check processing" but not actions outside of check processing). Although an error such as failing to notice that certain of Mr. Lamm's securities were not signed by the obligor, or were not payable to Mr. Lamm, is temptingly analogous to, say, a payor bank failing to notice that a check it pays out of a customer's account was not

signed by the customer, custodian banks are not subject to the sort of specific duties enumerated in Article 4 of the U.C.C. Thus, absent a contractual or other duty to ensure that Mr. Lamm's securities were in proper form, State Street is not liable.

Mr. Lamm attempts to show that the U.C.C.'s standard of care applies here by pointing to Paragraph 5 of the custody agreement, which says that "the transactions contemplated hereby are deemed funds transfers subject to the Uniform Commercial Code." Funds transfers are indeed subject to Article 4A of the U.C.C. *See, e.g.*, *Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 207 (1st Cir. 2012). But to the extent that Article 4A imposes a duty on banks to adhere to a standard of "commercial reasonableness," that duty relates to the security measures that banks put in place to prevent unauthorized transactions. *See* U.C.C. § 4A2-202. *See also Patco*, 684 F.3d at 208-09. Here, there is no allegation that State Street processed unauthorized funds transfers or otherwise breached any duties imposed by Article 4A. Indeed, Taurus was expressly authorized under the custody agreement to carry out the transactions at issue here. *See Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 714 (N.D. Ohio 2004) (rejecting unauthorized wire transfer claims brought by customer of custodian bank where customer's advisor had contractual authority to authorize transactions at issue). Thus, Article 4A of the U.C.C. cannot be the source of State Street's duty to Mr. Lamm.

In short, Mr. Lamm has failed to establish that State Street owed him an independent duty to monitor the investments on his account, verify their market value, or ensure they were in valid form. He has therefore failed to state valid negligence claims.

**B**

As the district court correctly concluded, Mr. Lamm's aiding and abetting claims fail because his factual allegations are insufficient to establish (or allow one to fairly infer) State Street's knowledge of the underlying fraud or breach of fiduciary duty by Taurus, as required by Florida law. *See Platinum Estates, Inc. v. TD Bank*, 2012 WL 760791, at *3 (S.D. Fla. 2012) (conclusory allegations of knowledge are insufficient to make out aiding and abetting fraud claim "where the facts in the complaint only suggest the defendant should have known") (quotation marks omitted). *See also Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2008 WL 926513, at *6 (S.D. Fla. Mar. 31, 2008) (same as to aiding and abetting breach of a fiduciary duty). Here, the specific facts alleged – that State Street accepted worthless securities, some of which were not signed by the obligor, not payable to Mr. Lamm, or in default – at most show that State Street "should have known" of Taurus' fraud and breach of fiduciary duty. Alleging that a bank disregarded "red flags" such as "atypical activities" on a customer's

account is insufficient to establish knowledge. *See Citco Grp. Ltd.*, 2008 WL 926513, at *6. *See also Rosner*, 2008 WL 5416380, at *6.[9]

The contrary case that Mr. Lamm cites, *In re E.S. Bankest, L.C.*, 2010 WL 1417732, at *20 (Bank. S.D. Fla. 2010), is distinguishable because there the defendant auditors, by accepting audit evidence from the client they were supposed to be independently auditing, were acting in direct contradiction of their purported role (so much so that it would "cause the hair on the back of [an auditor's] neck to stand up," *id.* at *2), raising a very strong inference of conscious wrongdoing. State Street, in contrast, was authorized to rely on Taurus' investment instructions and had no duty to scrutinize the security instruments it submitted. Thus, the fact that certain securities had facial defects, by itself, does not raise a plausible inference that State Street knew of Taurus' wrongdoing. *Cf. O'Halloran*, 350 F.3d at 1205-06. Therefore, Mr. Lamm's allegations were insufficient to state a claim for aiding and abetting fraud.

## C

Mr. Lamm also asserts claims for breach of fiduciary duty and negligent misrepresentation. We agree with the district court's conclusion that, although Mr.

---

[9] We note, as did the district court in *Platinum Estates, Inc.*, that it is unclear whether aiding and abetting fraud exists as a cause of action in Florida. *See Platinum Estates Inc.*, 2012 WL 760791, at *3 n.3. *See also Caledonia Bank & Trust ltd. V. Fifth Third Bank*, 2013 WL 5272807, at *3 (M.D. Fla. Sept. 17, 2013); *Tippens v. Round Island Plantation L.L.C.*, 2009 WL 2365347, at *5 (S.D. Fla. Jul. 31, 2009); *ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). We assume, without deciding, that aiding and abetting fraud is a valid cause of action under Florida law.

23

Lamm may have unilaterally relied on State Street for protection from Taurus' misconduct, the custody agreement and the facts alleged in the complaint establish an arm's length bargain imposing limited obligations on the parties, not a relationship of "trust and confidence" or "special circumstances" as required to make out a fiduciary duty claim. *See Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. 2009) (bank does not owe fiduciary duty in arm's length transaction), *aff'd*, 395 Fed. App'x 583 (11th Cir. 2010). As for the negligent misrepresentation claim, Mr. Lamm has not pled facts sufficient to establish that State Street intended to induce him to rely on its alleged representations as to the validity of his securities, as required by Florida law, *see Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985), especially since Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims. *See Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1511 (11th Cir.1993) (negligent misrepresentation claim sounds in fraud under Florida law).

## IV

As events of the past and present unfortunately remind us, investors are sometimes easy targets for unscrupulous financial advisors.[10] We empathize with

---

[10] *See, e.g.*, JORDAN BELFORT, *THE WOLF OF WALL STREET* (2007); MITCHELL ZUCKOFF, *PONZI'S SCHEME: THE TRUE STORY OF A FINANCIAL LEGEND* (2006).

Mr. Lamm, who was defrauded by Mr. Tagliaferri and Taurus, but on the facts alleged Mr. Lamm cannot hold State Street liable for his losses.[11]

**AFFIRMED.**

---

[11] We uphold the district court's denial of leave to amend because Mr. Lamm did not submit a copy of or set forth the substance of the proposed amendment. *See Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999).

25